### KIT HOLMES v. THE STATE.

No. 2334. Decided May 7, 1913.

Rehearing denied June 4, 1913.

**1.—Burglary—Accomplice—Charge of Court.**

Where, upon trial of burglary, there was no evidence that two of the State's witnesses were accomplices, there was no error in the court's failure to charge thereon.

**2.—Same—Charge of Court—Accomplice—Requested Charges.**

Where the main State's witness was an accomplice and was so designated by the court and a proper charge on accomplice testimony was submitted, there was no error in the court's refusal of requested charges on the same issue.

**3.—Same—Copy of Indictment—Names of Witnesses.**

Where, upon trial of burglary, the defendant was served with an exact copy of the indictment presented by the grand jury and filed in court, with the exception that the witnesses shown on the back of the indictment were left off, there was no error. Following Hart v. State, 15 Texas Crim. App., 202, and other cases.

**4.—Same—Special Prosecutor.**

The court was not required to furnish defendant with a list of subscribers to the fee paid the special prosecuting attorney.

**5.—Same—Jury and Jury Law—Challenge.**

There was no error in sustaining the State's challenge to a juror for cause, because the juror's sister had married defendant's brother; besides, it was not shown that injury resulted to defendant. Following Oates v. State, 67 Texas Crim. Rep., 488.

**6.—Same—Variance—Ownership.**

Where no variance appeared in the record between the allegations in the indictment and the proof as to the ownership of the alleged burglarized house, there was no error.

**7.—Same—Evidence—Convict—Pardon.**

Where defendant showed that the main State's witness was a convict and the State, thereupon, showed that the witness was restored by full pardon to citizenship, there was no error in admitting his testimony.

**8.—Same—Evidence—Other Offenses.**

Where, upon the trial of burglary, the evidence showed that the State's witness had been previously convicted of burglary, but pardoned, there was no error in refusing to admit testimony of other burglaries of which the witness had spoken in jail.

**9.—Same—Accomplice—Immunity.**

Where defendant showed that the State had agreed with the main State's witness not to prosecute him in certain cases, there was no error in permitting the State to show that the witness was not expected to testify to anything but the truth.

**10.—Same—Evidence—Bill of Exceptions.**

Where, upon trial of burglary, the evidence showed that some ribbon was taken from the burglarized house, and that a young lady wore some ribbon suiting the description and of the same kind of ribbon taken from the alleged burglarized house, and that defendant had been in her company constantly before and after the alleged offense, there was no error in admitting this in evidence; besides, the bill of exceptions was defective.

**11.—Same—Evidence—Practice.**

Where the same class of testimony was admitted without any objection, there was no error in overruling an objection to this character of testimony thereafter; besides, the same was admissible.

**12.—Same—Evidence—Rebuttal.**

Where, upon trial of burglary, some of the alleged stolen ribbon was found in possession of defendant's lady companion shortly after the alleged burglary, and defendant on cross-examination brought out the fact that State's witness' daughters also sometimes bought ribbon, there was no error in permitting the State to show in rebuttal that they did not buy ribbon in such quantities as found with the said lady companion of defendant.

**13.—Same—Evidence—Impeaching Own Witness.**

Under article 815, Code Criminal Procedure, a party may attack the testimony of his witness, when injurious to his cause, in any manner, except by proving the bad character of the witness.

**14.—Same—Charge of Court—Accomplice—Corroboration.**

Where, upon trial of burglary, the main State's witness was an accomplice and the court submitted a correct charge on the law of accomplice testimony, there was no error. Following Hoyle v. State, 4 Texas Crim. App., 239, and other cases.

**15.—Same—Accomplice—Corroboration—Sufficiency of the Evidence—Circumstantial Evidence.**

The testimony of an accomplice may be corroborated by circumstantial as well as positive testimony, and insignificant circumstances sometimes afford most satisfactory evidence of guilt and of corroboration of an accomplice's testimony, and the corroboration is sufficient when it tends to connect the defendant with the offense committed. Following Jones v. State, 4 Texas Crim. App., 529, and other cases.

Appeal from the District Court of Wood. Tried below before the Hon. R. W. Simpson.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Jones & Jones* and *M. D. Carlock,* for appellant.

*C. E. Lane,* Assistant Attorney-General, and *J. H. Beavers,* for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of burglary and his punishment fixed at three years in the penitentiary. The indictment was filed November 15th and he was tried December 16, 1912. The uncontradicted testimony shows that the depot building of the Missouri, Kansas & Texas Railway Company at Alba, in Wood County, was burglarized on the night of August 8, 1912. W. L. Mathis was the agent of the said railway company at said point and as such he had the actual possession, charge and control of said depot at the time it was burglarized and it was so burglarized and certain property stolen out of it that night without his knowledge and consent, etc.

Si Davis, a witness for the State, and who was an accomplice, and so charged by the court, testified: "I know the defendant, Kit Holmes. On or about the 8th day of August, 1912, in Wood County, I went to the defendant and asked him if he wanted some whisky and said let's get some whisky out of the depot. He agreed to do so. I told him I would come to the stable and wake him up, so about 1 or 2 o'clock in the morning I went to the stable and woke the defendant up. We went down to the depot of the Missouri, Kansas & Texas Railway Company and secured two iron bars and prized around quite a while before we got in. We finally got in the south door by putting the crowbars under the bottom of the door and prizing it open and got in. We took seven packages of whisky and a case of beer. I took the whisky and carried it and hid it over in Mr. Woodson's sorghum field. The defendant took the beer. About the time we was fixing to go I saw somebody coming along. He was a fellow who worked at the market, and had some dogs. I told the defendant to come on, yonder was somebody and we had better get away. He said he was trying to get some ribbon, and had gotten some ribbon for his girl. We then got away. The next day I brought him up a bottle of whisky and he gave me some

of the beer. The beer was hid back of the stable in a pile of refuse from the stable." Cross-examined: "I did not see the ribbon but only know he got the ribbon from what he said. He told me he was trying to get some ribbon for his girl. I do not know who first mentioned it about going to the depot, but I think maybe I did."

Said witness Mathis testified: That on August 8, 1912, at night, said depot at Alba was burglarized; that it was broken open, two crowbars were used in prizing the south door of the depot open; the door was a sliding door; the bottom worked in a groove made by some 2x4's, the top kept in place by a roller; the crowbars were put under the door and prized open so as to admit the parties to the burglary.

On cross-examination: That the next morning after the burglary he examined around the depot and found that a small package or caddy of tobacco and looked like some rolls of ribbon had been taken out of a box that was broken open, and seven packages of whisky and one case of beer containing three dozen bottles of beer; that he found the empty beer case out near the depot; he found the crowbars but did not find the whisky and alcohol; he did not know how much ribbon they got; that the ribbon box broken open was shipped to Mrs. Schovall, she declining to take it, and directed that it be returned to the consignor and before it was returned it was broken into as stated; that he did not know whether anything was taken out of the box or not; that he saw ribbon in the box and noticed an empty space large enough for two or three bolts of ribbon and just supposed that some ribbon was taken. On redirect: That there was a piece of the box that the ribbon was in torn off and he could see a space where it looked like two or three bolts of ribbon had been taken.

Mrs. Schovall, who lived at Alba, testified: That prior to the burglary she contemplated going into the millinery business at Alba and ordered a bill of goods from a Dallas house; that the bill of goods to the amount of $176.25 arrived at the depot at Alba the latter part of July, 1912; that she did not receive the goods but directed their return to the consignor; that there were ribbons in her order, some of them wide ribbons and some narrow; that they were of different widths; some were as wide as your hand, or four or five inches, then some narrow; the colors were blue and white. This was what she ordered; that the wide ribbon comes ten yards in a roll and is used by young ladies for making sashes to wear. She further testified that she was afterwards in the Dallas house which had shipped these goods to her and they did not complain to her of anything being short when the goods were returned.

Several witnesses testified that a young lady by the name of Miss Minnie Loyd, who for several years before this burglary had lived in Mississippi, but before her removal to Mississippi with her parents had lived at Alba, in June, 1912, came to Alba on a visit to her kinfolks and others, and remained on this visit till early in November, but returned to Mississippi just before the grand jury met which indicted

appellant in this case; that during this whole time while this young lady was on this visit at Alba, appellant visited her, took her to picnics in his buggy all along during her visit there, and that he was the only man who did visit, go with and pay attention to this young lady while she was on this visit; that when she left he took her to the depot in his buggy; the train left Alba at 7:02 p. m.; that he went on the train with her and left with her when the train departed, sitting on the same seat with her; that there were two stops of the train within a comparatively short distance from Alba; that night between 8 and 9 o'clock he was seen at his livery stable. There was no secret about the return of this young lady to Mississippi, it being generally known in Alba that she was to leave at the time or about the time she did leave.

Mrs. Patten, a State's witness, testified: That she knew said Minnie Loyd, had known her a number of years, knew her before she moved to Mississippi; that Miss Minnie formerly lived at Alba and came out some time before the burglary to visit Alba and stayed some time at her house. "On the day of the Golden picnic Miss Minnie went to the picnic with Kit Holmes; that she stayed all day; that it was on Monday or Tuesday, three or four days after she came back from the Golden picnic I saw her with some ribbon. She told me on Sunday before that she was going to buy or get her a sash or something like that. It was blue and white and was rolled upon the fingers and wrapped up in a white piece of paper. She got it out of her purse, a large handbag about fourteen inches long. This was several days after she got back from the Golden picnic. I do not know how many days but some three or four. . . .

"The picnic at Alba was on Thursday, Friday and Saturday before picnic at Golden, which is eight miles from Alba. I did not see the defendant at my house during the picnic at Alba, but saw him on the Alba picnic grounds with Miss Minnie Loyd. Other young men besides the defendant were at my house while Miss Loyd was there; can not say whom they came to see. I never saw any young man but the defendant go out with Miss Loyd while she was at my house. She and defendant went to the Golden picnic alone, in a buggy. She carried this purse, from which I saw her take the ribbon with her to the Golden picnic. There were two pieces of ribbon, one blue and one white, and ten yards in each piece. Miss Loyd came from toward her trunk with the purse in her hand, and I suppose she got it from her trunk; she took the two pieces of ribbon from the purse and showed them to me. I had been in her trunk, and had never seen this ribbon before. She had sent to town by me and got ribbon, but it was narrow, black ribbon."

Cross-examined: "I do not mean to say that I searched Miss Loyd's trunk for ribbon. I never looked in there for ribbon. I just went in there when I wanted anything, like I would in my daughter's trunk. The ribbon may have been in the trunk before, but I had never seen it in there. There are dry goods stores in both Golden and Alba. Miss Loyd was not at my house all the time after she returned from the

Golden picnic and before she showed me the ribbon. I sometimes buy ribbon for my daughter. Miss Loyd went to and returned from the Golden picnic with the defendant.

"It was known generally in Alba that she was going to leave and go back to Mississippi. The defendant kept company with her while she was here, was with her several times, I don't know how many times. She came from towards her trunk where her purse was with the ribbon in her hands and says: 'Mrs. Patten, I want to show you some ribbon I have got.' The ribbon was not rolled up like it comes but was rolled on the two fingers and was wrapped up in white paper. There is nothing unusual in young ladies having ribbon to make sashes to wear. Most all young ladies have ribbon for sashes and this was ordinary ribbon. She told me some time ago that she was going to get her some ribbon to make her a sash. There was ten yards in each roll. It takes about five yards to make a sash, so there was enough to make four sashes, two blue ones and two white ones."

On redirect examination she said that she never bought for her daughters as much as twenty yards of ribbon at one time; that her daughters did not have a position like Miss Minnie Loyd.

Charles Austin, for the State, testified that he was city marshal of Alba at the time of the burglary in question and went to the depot the next morning; that he examined the door that had been broken open; that it had rained the night of the burglary; that he saw some tracks but could not tell much about them other than it looked like there were two tracks; he also examined the depot; saw where a box of notions had been broken open, a side of the box torn off and some ribbon had been taken out; could not tell how much ribbon was gone; saw one piece or bolt of blue ribbon on the floor and some paper that was around the ribbon scattered on the floor; that he found an empty beer case on the outside of the depot; that he saw defendant with Miss Loyd frequently on public occasions; never saw any other young man with her or defendant with any other young lady while Miss Loyd was there.

A. C. Alston testified: "I saw the box containing the ribbon next morning in the depot after the depot had been burglarized. The box had been opened and something taken out of it. I saw a bolt of ribbon on the floor."

Mr. W. Williams testified: "I run the market. The young man that works for me comes to the market about 4 in the morning. He has some dogs that follow him. He gets there first and then I come down and relieve him and he goes to breakfast."

W. F. Woodson, for the State, testified: That on Sunday after the depot was burglarized he was out in his sorghum patch and saw some tracks going out of the patch; he went out and found some whisky and alcohol; that he put the whisky in his barn; he knew about the depot being burglarized and some whisky having been stolen; that a month or so afterwards he found a jug of alcohol in another place in his sorghum patch; the stopper had come out of it and it had turned yel-

low; he reported this to the officers and got them to look at it and see what it was; he turned it over to the officers.

On cross-examination: There were three quarts of the whisky he first found; that he took it to his barn and himself and boys and son-in-law drank it; that he did not report that to the officers; he knew the depot had been burglarized; that he lived near the depot and right adjoining Si Davis.

On redirect examination: That he found three quarts of Craddock whisky and something like a gallon of alcohol in his sorghum patch; that he told everybody he met about finding the whisky, he did not keep it any secret; that he did not tell the Missouri, Kansas & Texas agent about finding it. "After the defendant was put in jail, and returned to Alba, and shortly before this court met, the defendant in a conversation with me, told me that Si Davis put the whisky in my sorghum patch; he said Si's wife saw us when we found it."

On recross-examination he said: "Defendant said Si Davis told him he put it there, and that Si's wife 'saw us when we found it.' The defendant jokingly said something to me about the price of my sorghum seed, and in this connection said what he did about the whisky. I knew of the burglary of the depot the next morning after it occurred, and heard that whisky was taken from the depot; and I supposed the whisky I found was some of it. Si Davis and the defendant had been in jail together before the conversation I had with the defendant."

On redirect examination he said: "He thought the defendant said Si Davis told him that he put the whisky in his (witness') patch; and upon recross-examination, the following question was asked: 'Now, Mr. Woodson, did defendant say Si put it there, or that Si said he put it there?' and the witness answered: 'Well, I won't be positive about that, but anyway he said Si put it there.'"

Bob Murdock, for the State, testified: "I live at Alba, have known defendant and witness, Si Davis, for a number of years. On the morning after the burglary I walked into the defendant's stable and was talking to him and Si Davis. I told them they had better look out they was tracking out around there where the burglary had been committed at the depot the night before, and Si Davis immediately changed his shoes and jumped and cut some kind of monkey shines, and defendant laughed and that there was all there was to it, and Si Davis gave me a drink of whisky out of a bottle, and defendant was there somewhere about the stable. I don't know whether the defendant saw Si give me the whisky or not."

J. D. Hill testified: That he lived at Alba and had for several years; that he was at the depot the night before the depot was burglarized. "I saw defendant with a case of beer. The next morning I went to the depot to get some whisky that I had ordered and I found that my whisky, together with some others, had been stolen from the depot. I went over to defendant's place of business, the stable, and told him

about losing my whisky, and he gave me a drink of whisky out of his bottle that was setting in the office."

On cross-examination: "I saw the defendant at the depot the evening before the burglary with four bottles of whisky. That is, a box that looked like it contained about four bottles, at the depot. He was loading it in a delivery wagon with a case of beer. I tried to get mine but it was so late the agent wouldn't let me have it."

On redirect examination the State asked the witness: "Is it not true that a few minutes before you was put on this stand as a witness you told the State that you did not see the defendant carry any whisky away from the depot the evening before, but only saw him with a case of beer?" The witness answered: "I did not tell you (speaking to the district attorney) that I did not see the defendant carry any whisky away from the depot. You did not ask me whether I saw him at the depot with whisky or not. You only asked me whether or not I saw him carry any away from the depot and I told you 'No.' "

By some six or eight witnesses appellant proved that they knew the general reputation of Si Davis for truth and veracity at Alba, and that it was bad. Appellant also showed that Si Davis then had pending against him four separate indictments for burglary and that he had agreed with the State to testify for the State in this case, in consideration that the State would let him plead guilty to two of the indictments with a penalty of two years each that the State would dismiss the other two cases against him; that in 1893 he had been convicted in Hunt County and sent to the penitentiary two years for forgery and that in 1902 he was sent from Hopkins County to the penitentiary for two years for burglary; that he served both sentences. The proper judgments and sentences of these two convictions were introduced. The State then proved and introduced in evidence two pardons—the one for the first offense by Governor Hogg and the other for the latter offense by Governor Lanham.

The above is in substance the testimony in full.

The appellant requested eleven separate charges. All of them were refused. He preserved and has in the record twenty-seven bills of exception. We have carefully considered all of his requested charges and all of his bills of exception. It is unnecessary to take them up in detail. We take it that appellant does not seriously claim that any material error was committed in, at least, most of the said assignments.

Neither of the witnesses, Murdock and Woodson, were accomplices and there was no evidence which would justify the court to submit to the jury the question of whether or not they were accomplices.

Si Davis was an accomplice, specifically so designated by the court and the proper charge in every way given requiring that his testimony should be corroborated. The court's charge on the subject was just such charge as has been uniformly approved in many cases by this court. It is unnecessary to collate the cases. This being so, none of appellant's special charges on that subject should have been given. None of

them are anything like as complete and accurate as that given by the court.

Appellant made no motion for a continuance but he did make a motion urging that the case be not tried because a copy of the indictment had not been served upon him two days before the case was called for trial. His motion is very meager, but taking that in connection with the qualification by the judge of his bill to the action of the court in overruling his motion, it appears that his sole claim that a copy of the indictment had not been served upon him was the fact that the names of the witnesses were not on the copy of the indictment which was served upon him. The judge qualified the bill as follows:

"The indictment served on the defendant was an exact copy of the indictment presented by the grand jury and filed in court, with the exception that the witnesses shown on the back of the indictment presented by the grand jury were left off of the back of the copy of the indictment served on the defendant, Si Davis appeared as a witness on the back of the original indictment, and the sheriff informed the court that the defendant, Kit Holmes, and the said witness were confined in jail together, and if the said Holmes found out that the said witnesses had turned State's evidence against him, he was afraid they would have trouble in jail, and asked if it was necessary for the names of the witnesses to be written on the back of the copy of the indictment served on defendant; the court informed him that it was not, whereupon the clerk left them off of the copy served on the defendant. This action was taken without the knowledge or the consent of defendant or his counsel." This does not present any reversible error. Hart v. State, 15 Texas Crim. App., 202; Walker v. State, 19 Texas Crim. App., 176; Lesslie v. State, 47 S. W. Rep., 367. It is needless to cite other cases.

By another bill appellant complains in the same way in this case as he did in his other case, recently decided, that his special prosecutor, Mr. Beavers, was not required by the court to furnish him a list of the subscribers to the fee raised and paid Mr. Beavers for prosecuting him. This question was correctly decided against appellant in his other case.

The court did not err in sustaining the State's challenge to the juror Patent, because the juror's sister had married defendant's brother. Even if this had not been a good cause for challenge, no injury whatever is attempted to be shown by appellant in his bill on that subject. Oates v. State, 67 Texas Crim. Rep., 488, 149 S. W. Rep., 1194, and cases there cited.

There is no variance between the allegations in the indictment and the proof as to the ownership of the depot under the law. Art. 457, C. C. P.

Appellant showed by proper copy of the judgment of conviction and sentence that in 1893 said witness, Si Davis, had been convicted for forgery and sentenced and served two years therefor, and that in 1902 he had been convicted for burglary and served two years sentence. The State then produced and introduced in evidence a full pardon for the

first offense by Governor Hogg and in the second offense by Governor Lanham. The pardon issued to said Si Davis by Governor Lanham provided: "Now, therefore, I, S. W. T. Lanham, Governor of Texas, do by virtue of the authority vested in me by the Constitution and laws of this State, hereby for reasons specified now on file in the office of the Secretary of State, grant the above named convict a full pardon and restore him to full citizenship and the right of suffrage to take effect at the expiration of his term, towit, the 11th day of July, 1904." This pardon was dated June 28, 1904. The State proved that Davis served the full term of his sentence. Appellant's objection to said Si Davis testifying because said pardon by Governor Lanham was a conditional one, is, therefore, incorrect as stated in the face of it. It was a full pardon, and restored him to full citizenship, etc., but was to take effect thirteen days after the date of it. C. C. P., art. 778, subdi. 3; Easterwood v. State, 34 Texas Crim. Rep., 400, and authorities cited in Judge White's Ann. C. C. P. under said article of the Code.

The court did not err in refusing to permit appellant to ask the witness, Si Davis, and the witness to answer, that he had told Lee Majors, the jailer, while he was confined in the jail at Quitman that he had burglarized every town around there except Quitman and Winnsboro, and he wanted to break jail so he could burglarize them. Neither did the court err in not permitting appellant to ask said witness and him to answer that he had committed more than twenty burglaries in twelve months. Conway v. State, 33 Texas Crim. Rep., 327; Wright v. State, 63 Texas Crim. Rep., 429.

On cross-examination appellant asked the witness, Si Davis, and had him testify that the State had agreed to let him off for four years in the penitentiary on four cases they had against him, provided he would testify as a witness for the State in this case. The court did not err, therefore, in permitting the State on redirect examination of this witness on this point to ask him if the State's counsel or anyone connected with the State tried to get him to testify to anything except the truth, to which he answered no.

After the style and number of this cause and the term of court, appellant's ninth bill of exception is as follows:

"Be it remembered that on the trial of the above entitled and numbered cause when the same was called for trial on the 25th day of November, 1912, in the District Court of said county, and while the State witness, Mrs. Pearl Patten was on the stand testifying in behalf of the State, State's counsel asked the witness on her direct examination if she had at any time after the burglary alleged to have been committed or a few days thereafter seen Miss Minnie Loyd with any ribbon. To which the witness answered that a few days after the burglary Miss Minnie Loyd accompanied the defendant to Golden to a picnic, and some three or four days after they returned that she saw Miss Minnie with twenty yards of sash ribbon. The kind young ladies usually buy to make sashes. Defendant objected to answer because the same was

irrelevant and immaterial and because the same was not in his presence, and because the same was in no way connected with him or him with any ribbon, and because the same was not identified as the ribbon alleged to have been stolen. Because the same could not be used for any purpose against the defendant, of which objections was by the court overruled, to which ruling of the court defendant then and there excepted, and files this his bill of exceptions and asks that the same be considered, examined, approved and ordered filed as a part of the record herein.

"Approved and ordered filed with the qualification that the State contended that the ribbon seen by Mrs. Patten was same kind of ribbon taken from depot and that it was given to Miss Loyd by defendant on their trip to Golden picnic."

This bill is clearly insufficient to require this court to review the question attempted to be raised by the bill. Conger v. State, 63 Texas Crim. Rep., 312; Ortiz v. State, 151 S. W. Rep., 1059, and authorities cited in these opinions. It is apparent from the reading of this bill that the status of the case is not shown in any such way that this court can tell from this bill alone that any error has been committed. It will be also noted that appellant states as his objections merely that the answer was irrelevant and immaterial and not in his presence, and was in no way connected with him or with any ribbon, and that the ribbon was not identified as the ribbon alleged to have been stolen. The uniform holding of this court is that the court in approving a bill does not approve as facts the objections stated in the bill. They are mere objections. Even if we could consider it, the evidence was clearly admissible.

The court did not commit any reversible error in permitting Mrs. Patten to testify that Miss Minnie Loyd left Alba to go back to Mississippi, where she lived, about the time of the convening of the court. This same testimony was given by several other witnesses without any objection whatever from appellant. In fact, it seems to have been proven by both parties and conceded as a fact without any question.

Appellant, on cross-examination, proved by the witness Mrs. Patten that she had two grown daughters and asked her if she ever bought ribbon for them, to which she answered that she did. The court did not err in permitting the State on this point, on redirect examination of said witness, to ask her: "Do you ever buy your daughters as much as twenty yards of ribbon at one time?" To which she answered that she did not. This was a proper cross-examination or re-examination of this witness on a matter drawn out by the appellant.

Article 815, Code of Criminal Procedure, expressly provides that a party introducing a witness may attack his testimony when the witness' evidence is injurious to his cause, in any manner, except by proving the bad character of the witness. The court did not err in permitting the State to ask the questions complained of on redirect examination of its witness Hill.

As stated above, the court's charge on the corroboration of the accomplice witness, Si Davis, was full and correct. Appellant's special objection to the eleventh paragraph of the court's charge, which is as follows: "By 'corroboration' is meant that the corroborative evidence to be sufficient, must, of itself, and without the aid of the accomplice testimony, in some degree, tend to connect the defendant with the commission of the offense for which he is on trial; but it need not be sufficient of itself to establish his guilt. It must tend, directly and immediately, to connect the defendant with the commission of the offense," is not well taken. This charge is in accordance with the many decisions of this court, even if the word "corroboration" had to be defined at all. Hoyle v. State, 4 Texas Crim. App., 239; Hozier v. State, 6 Texas Crim. App., 501, and other cases cited by Judge White in section 997 of his Ann. C. C. P.

The testimony of an accomplice may be corroborated by circumstantial as well as positive testimony. Apparently insignificant circumstances sometimes afford most satisfactory evidence of guilt and of corroboration of an accomplice's testimony. It is not essential under the law that the evidence of the accomplice must be corroborated in every detail, or to every material fact. The corroborative evidence is sufficient, as stated by the statute, when it tends to connect the defendant with the offense committed. In our opinion the evidence in this case by the accomplice, Davis, is sufficiently corroborated by the testimony of other witnesses and the circumstances proven in this case. Jones v. State, 4 Texas Crim. App., 529; House v. State, 2 Texas Crim. App., 304; Simms v. State, 8 Texas Crim. App., 220; Clanton v. State, 13 Texas Crim. App., 139; Red v. State, 53 S. W. Rep., 618; Payne v. State, 50 S. W. Rep., 363; Darlington v. State, 50 S. W. Rep., 375; Nash v. State, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709; Warren v. State, 67 Texas Crim. Rep., 273, 149 S. W. Rep., 130; Reynolds v. State, 17 Texas Crim. App., 413; Nopfsinger v. State, 7 Texas Crim. App., 301; Meyers v. State, 14 Texas Crim. App., 35.

We have carefully gone over the whole record and all of appellant's claimed errors in this case and in our opinion none of them present reversible error. The judgment will, therefore, be affirmed.

*Affirmed.*

[Rehearing denied June 4, 1913.—Reporter.]