## JOE COOPER V. THE STATE.

No. 3549. Decided June 2, 1915.

Rehearing denied June 25, 1915.

**1.—Murder—Accomplice—Corroboration—Sufficiency of the Evidence.**

Where defendant was tried as an accomplice to murder, and the chief witness against him was his principal in the offense, who testified as the indictment alleged that the defendant then and there advised, commanded and encouraged him, etc., to kill a certain party, and that in attempting to do so, he killed another by mistake, and said testimony of said principal was sufficiently corroborated in every material matter, the conviction is sustained, although there was conflict of testimony, and contradictions and inconsistencies in the testimony of some of the witnesses.

**2.—Same—Jury and Jury Law—Challenge for Cause.**

Where upon trial of murder as an accomplice, and a conviction of murder in the second degree under the former statute, defendant's cause for challenge of one of the jurors was overruled, and the record showed that the court did not err in holding the juror to be qualified, there was no reversible error.

**3.—Same—Murder in the Second Degree—Charge of Court.**

Where, upon trial of murder as an accomplice, it was shown by the evidence that the principal, in attempting to commit the offense, by mistake killed a person other, than the one designed to be killed by the accomplice, and the court in his charge to the jury, instead of using the words of the statute, charged the jury that the accomplice (defendant) to the offense originally intended, should receive the punishment affixed to murder in the second degree, there was no reversible error.

**4.—Same—Charge of Court—Mistake.**

Where defendant was charged as an accomplice to murder, and the indictment alleged that the principal killed another person than the one originally designed to be killed by the accomplice, through mistake, and the court in his charge substantially submitted the allegations in the indictment and the issue of mistake, and instructed the jury further that if the allegations in the indictment were sustained by the evidence beyond a reasonable doubt, to convict the defendant of murder in the second degree, there was no reversible error, and the contention that the issue of mistake was not sufficiently submitted to the jury, was untenable.

**5.—Same—Accomplice—Charge of Court—Corroboration.**

Where upon trial of an accomplice to murder, wherein the principal was the chief State's witness, the court gave the usual correct form on the issue of accomplice testimony, and in addition thereto, instructed the jury that it is not necessary that the corroborative evidence, if any, be sufficient in itself and alone, outside of and independent of the testimony of the accomplice, there was no reversible error. Following Holmes v. State, 70 Texas Crim. Rep., 423, and other cases.

**6.—Same—Limiting Testimony—Credibility of Witness—Charge of Court.**

Where, upon trial of murder as an accomplice, defendant in various ways sought to contradict and impeach the testimony of a certain State's witness, and introduced the former district attorney to impeach said witness' testimony at a former trial, and the court correctly limited said testimony of said district attorney to the question of impeachment of the State's witness, and practically submitted the charge requested by the defendant, there was no reversible error, said testimony of the district attorney, supporting instead of im-

peaching the testimony of said State's witness. Following Brown v. State, 74 Texas Crim. Rep., 356, and other cases.

**7.—Same—Requested Charge.**

Where the requested charge was fully embraced in the court's main charge, there was no error in the court's refusal to give the same.

Appeal from the District Court of Bowie. Tried below before the Hon. H. F. O'Neal.

Appeal from a conviction of murder in the second degree; penalty, ten years in the penitentiary.

The opinion states the case.

*R. H. Jones* and *J. Q. Mahaffey,* for appellant.—On the question of the insufficiency of the evidence: Crowell v. State, 24 Texas Crim. App., 404; Welden v. State, 10 id., 400; Simms v. State, 8 id., 230; Clark v. State, 30 id., 402; Jernigan v. State, 10 id., 546; Dill v. State, 1 id., 278; Conway v. State, 33 Texas Crim. Rep., 327; Smith v. State, 38 S. W. Rep., 200.

On the question of challenge for cause to the jury: Myers v. State, 7 Texas Crim. App., 640; Hamlin v. State, 47 S. W. Rep., 656; Gallaher v. State, 50 S. W. Rep., 388.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of challenge to juror: Trotter v. State, 37 Texas Crim. Rep., 416; Deon v. State, 37 id., 506; Adams v. State, 35 id., 285; May v. State, 33 id., 74; Sawyer v. State, 39 id., 557; Suit v. State, 30 Texas Crim. App., 319.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted and convicted as an accomplice to the murder of Hub Anderson by Frank Rutherford on the night of September 25, 1911, and his punishment assessed at ten years in the penitentiary.

This is in effect the second appeal in this case. The first is reported in 69 Texas Crim. Rep., 405, 154 S. W. Rep., 989. A new indictment was found and the trial had in compliance with the opinion in that appeal. The case is stated in that report sufficiently to be understood without making a further statement.

Appellant contends with great earnestness and vigor that the evidence is insufficient to sustain the conviction in that the testimony of Frank Rutherford, who actually shot and killed the deceased, is not sufficiently corroborated. We have carefully read and studied the evidence again and again.

In order to discuss this question it will be proper to state the substance of some of the testimony. We do not propose to give all of the testimony nor the testimony in full of any witness. We may from time to time give portions of the testimony of a given witness. Appellant introduced impeaching testimony of some of the State's material witnesses. The State in rebuttal introduced some testimony sustaining them. The appellant claims that in some particulars there were con-

flicting or contradictory statements by some of these State's witnesses. All of this, under our law, both by statute and all the decisions, is for the jury. They are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. So that in giving the substance of the testimony we will not undertake to point out the claimed inconsistencies and contradictions, as we must assume under the law, that the jury believed the testimony of these witnesses, even though testimony of an impeaching character or contradictions or inconsistencies were shown. Some of the facts were established without controversy. Others were controverted.

Appellant, Frank Rutherford, the deceased (Hub Anderson), Clarence McDonald, and practically all of the witnesses, lived in the same immediate neighborhood in the country, and most, if not all of them, had thus lived for many years,—some of them all of their lives. Appellant was a married man and had several children, among others, four boys. The ages of his two older are not given, but evidently from all the testimony, the reasonable deduction can be drawn that the oldest was about the same age of Clarence McDonald, and the next older near the same age. Trouble arose between these boys, appellant's, on the one hand, and Clarence McDonald, on the other, at school. Evidently they attended the same school. When this trouble arose Clarence McDonald was about sixteen years of age. This trouble between these boys seems to have existed and was kept up to within a very short time of the killing. It resulted in serious trouble between appellant and Clarence McDonald personally. It was established beyond controversy that Hub Anderson was assassinated about 10 o'clock at night by Frank Rutherford. As we understand, this is conceded by appellant. Frank Rutherford so swore and all the other facts and circumstances so show. Frank Rutherford was a young negro man who had lived in said community all his life. He knew Hub Anderson, Clarence McDonald and appellant, and each of them knew him and they had known one another for many years. Frank Rutherford lived on Mr. Eli Goodman's place about two miles from appellant and was working for him. Rutherford's mother and his brother Jim lived on appellant's place and had been living thereon, according to appellant's testimony, three or four days at the time of the killing.

Among other things, Frank Rutherford testified in substance that several days, about a week or less, before the killing, appellant came into the field where he was at work, called him off to the fence where they were alone and told him that he wanted him to do something for him, and that it was he wanted him to kill Clarence McDonald; that he, Rutherford, did not then agree to do so; that on this occasion appellant talked with him a good little bit. In that conversation Cooper (appellant) told him why he wanted him to kill Clarence and that was that Clarence had shot him (appellant) and there had not been anything done about it. Cooper then told him he would give him $50 in a day or two if he would kill Clarence; that when they separated on that occasion he had not agreed to kill Clarence.

Again on Saturday before the killing the following Monday night, Cooper had a second interview with him when he was at his mother's on appellant's place; that he had spent the night before at his mother's and was there Saturday when appellant and his two sons came there to load some cotton; that after they loaded the cotton Cooper's boys went on to the gin with it; that Cooper then wanted to talk with him and called him out to the lot where they were alone; that he wanted to talk with him about the same thing,—the killing business; that Cooper asked him again if he was going to do what he wanted him to do, kill Clarence McDonald, and he then did not give him any satisfaction, did not then agree to do it; that they talked a right smart about it. Cooper told him he wanted him to kill Clarence McDonald; that he wanted him to kill him the next Monday night, and told him where to go and secrete himself for that purpose, and told him that Clarence McDonald would be riding a bay pony on the road by the place where he wanted him to secrete himself and kill him; that Cooper told him he (Cooper) would go away to Lydia; that Cooper said to him that a meeting was going on and that would be the last chance, the meeting would close that Monday night. Cooper told him how he would know Clarence McDonald that night; that he would be along behind a buggy or in front of the buggy riding a bay pony; that when Cooper left him on this occasion he still had not agreed to kill Clarence McDonald.

That on Monday about half past 12 or 1 o'clock Cooper (appellant) come to Mr. Goodman's where he (Frank Rutherford) was watering some horses at the lot; Cooper came on horseback from towards his home and again on this occasion brought up the conversation about wanting him to kill Clarence McDonald, and he (Rutherford) then agreed to do so; that Cooper told him when and where to do the killing,—to go over on the big road at the corner of a grass lot which was on Mr. McDonald's place; that Cooper said Clarence McDonald had shot him and there had been nothing done about it; that Clarence McDonald would come along on a bay pony, and told the witness how to do and all, to shoot him with a shotgun, with his brother Jim's gun; that Cooper asked him if he had any shells and a gun, and he told him he had not; that Cooper told him that he would get him the shells; that the gun was first mentioned on this occasion; that Cooper said he would give him $50 to do it and pay it in a day or two and that was the understanding they had; that Cooper gave him a "BB" buckshot shell; that he took that shell and that night shot deceased with it; that in this last conversation Cooper talked with him, he supposed, three-quarters of an hour; that while talking with him Will Gibson came there; that Mr. Goodman and his folks had gone to the meeting when appellant was at Goodman's house at the time; that Mr. Gibson lived on an adjoining farm and came there on this occasion to water his horses and stayed there only a short time; that Cooper did not talk to him concerning the killing in the presence of Mr. Gibson; that when Cooper left he went towards his home telling him he was going to

Lydia; that Cooper, in giving the directions of how he should go to the place that night to kill Clarence McDonald, told him the direction he should go, the road, where to hitch his horse and everything, and about where to stand,—that is, over on the corner in the grass lot right on the side of the road. Rutherford then tells how he carried out Cooper's instructions, and that he practically literally carried them out; told what sort of horse he rode, where he hitched him and how he left and where he went and where he stayed that night,—at his mother's; that the place where he killed Hub Anderson that night was a place where Clarence McDonald, if he had been at church, would have had to pass by to go to his home; that while he was thus secreted to kill Clarence McDonald a buggy passed coming from towards the church, but he did not know who it was; that it was a starlight night, no moon, kind of cloudy, not so light because one could not see very good at a distance; that after this buggy passed the next one to come along was Mr. Anderson; he was not very far behind the buggy; that at the time he (Rutherford) did not know it was Mr. Anderson; that he took it to be Clarence McDonald; he was not so very far behind the buggy; that he did not know who this person was on the horse, he took it to be a bay pony, that he was traveling slowly and there was a buggy behind him just a little way, about thirty or thirty-five feet; that this man on horse-back, followed by a buggy was on a bay pony and he took him to be Clarence McDonald; that he knew Clarence McDonald, and the man on horseback looked to him like Clarence McDonald, and he shot him; that at the time he shot him he was right close to him, about thirty or thirty-five feet; that he shot one time and ran away; that at the time he did not know he had hit or killed him, but thought he had hit him. He then testified, as stated, that he ran away from there, got his horse, ran into the fence with him, finally reaching his mother's, where he took and left the gun, and stayed there that night; that he was arrested very early the next morning; that he was taken by where the body of Hub Anderson still lay near where he had shot him and from there he was taken to jail, and placed therein, where he has been continuously kept ever since; that he had no talk with Mr. Cooper after the shooting and that Cooper had never paid him the $50; that he afterwards learned that the man he shot and killed was Mr. Hub Anderson; that he did not intend to kill Mr. Anderson, but at the time he intended to kill Clarence McDonald and thought he was shooting at Clarence McDonald at the time; that he had nothing against Clarence McDonald; that Mr. Cooper was not present when he shot Mr. Anderson; that the fact that Mr. Cooper had promised him the reward of $50 and got him to agree to kill Clarence McDonald was the sole cause for him shooting that man, Mr. Anderson.

The State proved by Mrs. Anderson, the widow of the deceased, and the testimony of others also showed, that Frank Rutherford had worked for her husband and that there was never any trouble between them; that they were on good terms at all times. In fact, there was not only no evidence which would show or tend to show that Frank Rutherford

had the slightest cause for killing Hub Anderson, but, on the contrary, showed affirmatively that there was no cause whatever that Rutherford could have had to have caused him to kill deceased. Nor was there any evidence which showed or tended to show that Frank Rutherford had any ill-will or cause whatever to kill Clarence McDonald other than to get the $50 which he said Cooper was to pay him for killing him. The evidence all tended to show that Rutherford had no cause whatever to kill Clarence McDonald other than to get the $50 which he said appellant had promised to pay him therefor. Mrs. Anderson and others testified that the killing occurred at the time and place and in the manner as testified by said Rutherford. She also testified that the deceased was riding a bay pony and that she was following just behind, driving the buggy with her children in it.

As stated, we get from the testimony, that trouble arose between appellant's two older boys and Clarence McDonald at school. Appellant took up this trouble himself.

Clarence McDonald, among other things, testified that about the middle of November, 1910, he was at John Clark's on Sunday; that Richard Cox was also there; that appellant came there drunk and jumped on him and tried to run his horse over him; that in order to prevent this he caught the horse by the bridle reins and went 'round and 'round with him; that appellant then said to him, "God damn you, I will fix you," jumped down off of his horse, got his knife out, and the women then present squalled and asked appellant to leave.

Richard Cox testified that on this occasion appellant said he wanted to kill Clarence McDonald, and Mrs. Clark and Mrs. Aydlott got him to take Cooper away; that he started home with him and appellant kept rearing and wanting to go back and kill Clarence McDonald; that he tried to pull his horse and go by McDonald's, but he would not let him. Clarence McDonald further testified that about two weeks after the occurrence at Clark's he was in a buggy and met appellant, who was in a wagon, in the road; that he turned to the right as far as he could because of the fence, but Cooper drove straight and ran into his buggy; that Cooper then looked back, laughed and said, "God damn little son-of-a-bitch, why didn't you get out of the road?" to which he replied, "I thought the road was public property and a public place." Appellant then said, "God damn your little soul, if you don't get out of the road next time,—" That when appellant thus cursed him he (appellant) jumped out of his wagon, Clarence still sitting in his buggy, when appellant further said, "You God damn little son-of-a-bitch, if you get out of that buggy I will kill you." That he then jumped out of his buggy, appellant threw off his coat, drew a rail on him, and when he got close to appellant he shot him with a pistol three times to keep him from hitting him with the rail; that at the time he didn't know that he had hit him, but learned afterwards that he did; that he did not fall; that appellant threw down his rail and ran; that he got in his buggy and went home.

All the testimony shows that for some ten days a meeting,—preach-

ing,—had been carried on in said community and the neighbors generally attended it; that the meeting closed Monday night, the night of the killing. Clarence McDonald further testified that he attended that meeting and that frequently he rode a bay pony back and forth to it, and was riding this bay pony and was about 120 to 130 yards behind when deceased was shot and killed that night; that on that night his people were traveling in a buggy ahead of him and behind the deceased; that appellant's folks also attended the meeting and he thought he had seen the appellant in attendance thereon; that he (the witness) rode that bay pony back and forth to the meeting most every night; that he had known Frank Rutherford all his life and there had never been any trouble between them. All the testimony showed that the deceased was shot in the breast with buckshot and died very soon after being shot.

Appellant himself testified that he saw Frank Rutherford at the time and place that Frank Rutherford testified he had the last two interviews with him, but denied he saw him in the field which Frank Rutherford testified was their first interview.

Mr. Gibson testified that he rode up to Mr. Goodman's to water his horses just after noon Monday, the day before deceased was killed that night; that Mr. Goodman and his family had just driven away from their home; that he saw appellant and Frank Rutherford there at the well where he watered his horses; that he left them there; that while there he heard no conversation between them; that when appellant came up, he got down, hitched his horse and went into the lot and spoke to him and Rutherford; that he (the witness) only remained there long enough to water his team and left Cooper and Rutherford there, close together. Gibson further testified that appellant must have met Goodman and his family just as they had left their home. Appellant, in his testimony, in effect, admitted that he had so met Goodman. The State, in its cross-examination, asked him, "Don't you know that you started to talk to him about your trouble with McDonald, and that Goodman said, 'I don't want to hear any more about that mess'? Didn't you call him off and start to tell him about your trouble and he said, 'I don't want to hear it' and walk off?" to which appellant answered, "Not about me and McDonald's trouble; we have spoken about this trouble but not in the way suggested in the question." On redirect examination on this point he testified that Goodman said he was in a hurry, and appellant said to him, "Hold on, Eli, do you remember my boy speaking any rough language to old man McDonald down at the church yesterday?" and he said, "Joe, I am in a hurry and I don't care to hear any more of yours and McDonald's trouble."

Mr. W. N. Anderson, a brother of the deceased, testified that he saw appellant on a certain occasion, fixing the time and place, soon after appellant had the shooting scrape with McDonald; that he (the witness) was trying to get Cooper to drop the trouble with Clarence McDonald and let everything go, and that Cooper said to him, "I won't do it, I won't be satisfied until Clarence McDonald and his daddy are both dead and in hell."

John Clark, one of appellant's witnesses, among other things, testified that he knew of the trouble between appellant and Clarence McDonald; that a short time, a week or two, before the killing he and appellant were talking about Clarence McDonald, and that appellant said to the witness, "He (McDonald) is hell." That the witness replied that he seemed to be. Whereupon, appellant said that if he had his way he wouldn't mess with nobody long.

Jeff Cornelius testified that he remembered when Cooper was shot by Clarence McDonald; that some time before when he met Cooper, tried to rent land from him, and on the occasion got in the wagon with Cooper and rode with him; that during this ride Cooper told him he (Cooper) was going to kill Clarence McDonald if he didn't stop school. The witness said it was about some trouble between Mr. Cooper's boys and Clarence McDonald he thought that caused it; that Cooper said he was going to kill Clarence McDonald if it cost him his place.

John Forsythe testified that he knew Cooper, Hub Anderson, Clarence McDonald and Frank Rutherford, and knew of the death of Hub Anderson; that shortly after Anderson's death, about a month, he had a talk with appellant about the matter at Dalby Springs; that with reference to the death of Hub Anderson the appellant (Joe Cooper) told him that he did not intend for the negro to kill Hub Anderson; that it was Clarence McDonald that they were after. Of course appellant denied the testimony of each of these witnesses.

The State proved by others, and the appellant himself testified, that in the evening of the night deceased was killed he went to Lydia to see his friend and partner in the hog business, Dave L. Smith, and stayed there that night. He also testified that he sent his two oldest boys to Loyd Miller's and that they stayed all night at Miller's that night. Doubtless the State in the trial court contended that this was very pertinent testimony, showing that appellant was fixing and did fix to establish an alibi for both himself and his two oldest boys with whom Clarence McDonald had had trouble. Appellant, in his testimony, showed that his said partner in the hog business was not at home when he reached there about night of Monday night, and that while he stayed there until some time late the next morning he did not wait until Smith returned, and that he did not on that occasion get to see him at all on the business he went there to see him about,—the hog business.

His witness Dave L. Smith, on cross-examination by the State, testified that he knew of the trouble between appellant and Clarence McDonald, and said the feeling between Joe Cooper and Clarence McDonald was bad and continued to be bad up until Anderson's death; that they hated each other.

Carroll Houston, another of appellant's witnesses, on cross-examination by the State, testified that he knew of the feeling that existed between Joe Cooper and Clarence McDonald in part; that he didn't try to keep up with it because it was bad; that he thought that there would be trouble over it.

Alf Simington, another of appellant's witnesses, on cross-examina-

tion, testified that he knew about the trouble appellant had had with Clarence McDonald; that he thought a state of bad feeling existed between them for some time prior to the killing; that appellant and Tom McDonald (Tom McDonald was Clarence McDonald's father) had a racket down there at the store one night and it came up about Clarence McDonald; that appellant told him about it there; that was just a short while before this killing,—he thought; that Cooper told him about that difficulty he had with Tom McDonald about Clarence McDonald; that it was a fact that Mr. Cooper's boys and Mr. McDonald's boys were having some trouble at school; that he knew there had been some considerable little trouble between Joe Cooper's boys and Tom McDonald's boys.

We think there can be no doubt but that the testimony unquestionably is sufficient to corroborate Frank Rutherford in every material matter. The jury undoubtedly believed this corroborating testimony and we think there can be no doubt but that taking all the testimony together, it was amply sufficient to sustain the verdict.

In appellant's first bill of exceptions, he contends that the court erred in holding that the juror Mitchell was not disqualified and in not sustaining his challenge for that cause. The bill claims that the juror was disqualified under subdivision 13, article 692, Code of Criminal Procedure, but it clearly shows that the action of the court in holding the juror qualified was in accordance with that subdivision of the statute and in accordance with a great many decisions of this court. Some of them are collated in section 747, White's Ann. C. C. P., and under said article of our Revised C. C. P.

The court, in the seventh, eighth and ninth paragraphs of his charge, quoted substantially, in the seventh and eighth, articles 79 and 80, Penal Code. Then in paragraph 9 he undertook to quote article 82 so far as applicable to this case, as follows: "If in the attempt to commit one offense the principal shall by mistake or accident commit some other under the circumstances above set forth in the preceding paragraphs, the accomplice to the offense originally intended shall, if both offenses are felonies by law, receive the punishment affixed to *murder in the second degree.*" The last few words of the statute are "receive the punishment affixed *to the lower of the two offenses.*" It will be seen that instead of copying literally those words in the statute, the court said, "receive the punishment affixed to murder in the second degree." Appellant complains of this charge to the effect that it is confusing and calculated to confuse and probably mislead the jury, and that if it had been some other offense intended other than murder, the party would not be liable to receive the punishment affixed to murder in the second degree. We think this contention shows no material defect in the charge. It could not have misled the jury in connection with other portions of the court's charge. It could in no way have misled the jury to find appellant guilty and could not have affected them in fixing the punishment. If appellant was guilty at all, he was guilty of murder in the second degree, and the court correctly told the

jury what the punishment for that offense was, and the fact that in closing paragraph 9 he told them he would receive the punishment affixed to murder in the second degree, could in no possible way, as we see it, have affected the merits of the case.

The indictment, after the necessary preliminary allegations, alleges that Frank Rutherford on September 25, 1911, in said State and county did then and there unlawfully, with malice aforethought, kill Hub Anderson by then and there shooting him with a gun; and that Joe Cooper, before the commission of said murder and killing of Hub Anderson, on September 24, 1911, did unlawfully, wilfully and with malice aforethought, advise, command, encourage the said Frank Rutherford to kill one Clarence McDonald and did then and there promise reward and favor to said Frank Rutherford to kill said Clarence McDonald, and the said Rutherford, while attempting and trying to kill said Clarence McDonald, shot and killed said Anderson, believing that he was shooting and shooting at said McDonald and thereby by mistake killed said Anderson while acting in virtue of and by reason of the promise of reward and favor of said Joe Cooper to kill said McDonald, said Cooper not being personally present when said offense was committed by said Rutherford.

The court in the charge first stated substantially and correctly what the indictment alleged and that appellant plead not guilty. He then proceeded to charge them the law of murder, malice aforethought, etc., in correct language. Then, in submitting the case to the jury for a finding, in the tenth paragraph, told them:

"Now, if you believe from the evidence, beyond a reasonable doubt, that Frank Rutherford did, in the County of Bowie and State of Texas, on or about the 25th day of September, 1911, with malice aforethought, either expressed or implied, towards Clarence McDonald, and with intent to kill said Clarence McDonald, unlawfully shoot, and thereby kill Hub Anderson, with a gun, believing at the time that said Hub Anderson was Clarence McDonald, and if you further believe from the evidence, beyond a reasonable doubt, that the defendant, Joe Cooper, did, in the County of Bowie and State of Texas, on or about the 24th day of September, 1911, and prior to the commission of said offense, unlawfully and wilfully, and with either expressed or implied malice aforethought, towards Clarence McDonald, encouraged and promised reward to said Frank Rutherford to kill and murder said Clarence McDonald, and that said Frank Rutherford was induced thereby to try to kill said Clarence McDonald, but in attempting or trying to kill said Clarence McDonald, he shot and killed Hub Anderson, believing he was Clarence McDonald, as herein charged, and that defendant, Joe Cooper, was not present in person when said offense was committed by said Frank Rutherford, then you will find the defendant guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any period of time that you may determine, and state in your verdict, provided it be for not less than five years."

Appellant objected to this paragraph on the ground that it authorized

the jury to find him guilty upon proof of a state of facts not alleged in the indictment, and upon proof of less facts than therein alleged as constituting the offense, and upon a different state of facts than alleged. And because thereunder the jury is authorized to find him guilty without finding that the alleged principal, Rutherford, shot and killed Hub Anderson by mistake, believing at the time he did so that he was shooting at Clarence McDonald. In other words, as he claims, that paragraph in effect withdrew from the jury the consideration of the vital issues by the pleadings of whether or not Rutherford shot and killed Hub Anderson by *mistake*.

It is elementary that the charge of the court must be taken as a whole, and when so taken, if it correctly presents the issue, it is no just criticism to take up separate paragraphs or portions thereof by themselves and attempt to show that they, taken alone, are incorrect. It is true this paragraph of the court's charge does not use the word "mistake." In another paragraph the court told the jury:

"If you believe from the evidence, beyond a reasonable doubt, that Frank Rutherford, with malice aforethought, shot and killed Hub Anderson, as charged, still if you believe or have a reasonable doubt that he knew or believed it was Hub Anderson, or someone besides Clarence McDonald, when he shot and killed him, then you will find the defendant 'not guilty,' even if you believe from the evidence, beyond a reasonable doubt, that prior thereto the defendant had encouraged him, and offered him a reward to kill Clarence McDonald."

Taking these paragraphs and the whole charge, there can be no question but that the language used, in substance and effect, required the jury to believe beyond a reasonable doubt that Rutherford shot and killed Hub Anderson by mistake, believing at the time he did so it was Clarence McDonald, and did not authorize the jury to convict him on any other state of facts. And in fact, told them, in effect, that if that was not the case to acquit appellant. We think appellant's objections to the charge are wholly untenable. The point was covered so as to make it unnecessary to give appellant's special charge No. 2.

In a separate paragraph the court charged that the witness Frank Rutherford was an accomplice, and literally gave the charge on that subject laid down in Campbell v. State, 57 Texas Crim. Rep., 301, p. 302, and added thereto this: "But it is not necessary that the corroborative evidence, if any, be sufficient in itself and alone outside of and independent of the testimony of the accomplice to convict the defendant." This is undoubtedly the law and was applicable and called for in this case. Holmes v. State, 70 Texas Crim. Rep., 423, p. 434, 149 S. W. Rep., 130, and cases there collated.

The testimony of the witness Forsythe, above stated, was important for the State. Appellant, in various ways, sought to contradict him, impeach and break down his testimony. For that purpose he introduced Mr. Keeney, the former district attorney who prosecuted said first case. Appellant sought to show by Mr. Keeney that said Forsythe did not so testify on said former trial. He failed in this, as we understand, for

the substance and effect of Mr. Keeney's testimony was that said witness did so testify on the former trial. In direct examination of Mr. Keeney he brought out that he had talked to this witness just before the former trial and that said witness had made some statement or that same statement to him prior to that trial, and that it was very difficult to get the witness to testify on that trial what he did. When the State took Mr. Keeney on cross-examination the same matters were gone over, and Mr. Keeney then testified that said witness had told him in substance the said same facts that he afterwards testified on the former trial and on this trial.

When the court prepared his charge he submitted it to appellant's attorneys. He had charged nothing about the consideration of said Keeney's testimony. Appellant, thereupon, objected to the charge because the court failed to tell the jury that the testimony of said Keeney, introduced by the State on cross-examination, that what he said Forsythe had testified on the former trial as given above "is not original evidence in this cause" and that Keeney's testimony as to what Forsythe so swore can not be considered for any purpose except for passing upon the credibility of said Forsythe as a witness and for no other purpose. This objection was repeated. The court, thereupon, added to his charge paragraphs 16 and 17 as follows:

"16. You are further instructed that the testimony of L. E. Keeney is not original testimony in this cause, and can not be so considered by you, but you may consider the testimony of said Keeney in so far as it may show similar statements made, if any, by the witness John Forsythe to said Keeney shortly after the transaction as said John Forsythe testified to on this trial at this term of the court.

"17. You are further instructed that you can not consider against the defendant any statements made by Frank Rutherford after Hub Anderson was killed, but you may consider such statements made by Frank Rutherford, if any, as to the guilt or innocence of said Rutherford."

And again submitted the charge to appellant's attorneys. They then made this objection to paragraph 16: Because the court does not specify therein what testimony of the witness Keeney "is not original testimony" and does not tell the jury that the testimony of Mr. Keeney with respect to what Forsythe testified on his previous trial and to what he said Forsythe told him before that trial "is not original testimony in this cause," and can not be considered for any other purpose than passing upon the credibility of Forsythe. It will be noted that the court in the first part of the sixteenth paragraph told the jury in the very language of appellant's objection, and as invited by him, that the testimony of Mr. Keeney "is not original testimony in this cause," and told the jury that it could not be considered by them as original testimony. No other reasonable construction could be put upon this part of the court's charge by the jury than that all of the testimony of Mr. Keeney was not original and that they could not consider it as such. No doubt all of this matter was thoroughly argued to, and fully

understood, by the jury and that they knew therefrom and from said charge that Mr. Keeney's testimony could have been considered for no other purpose than affecting the credibility of said Forsythe, if it did. It may be that it would not have been amiss for the court to have gone further in that charge and told the jury that they could consider it only for the purpose of affecting the credibility, if it did, of said Forsythe, but having in substance and in effect so charged, the failure to add that to it, does not present reversible error. It will be noted that no objection whatever was made to the latter part of paragraph 16. As a matter of fact, the testimony of Mr. Keeney was supporting, as a circumstance, and did support in effect and not impeach, the testimony of Forsythe; but to have so told the jury would have been upon the weight of the testimony which evidently the court by this charge was endeavoring to avoid. (Brown v. State, 74 Texas Crim. Rep., 356, 169 S. W. Rep., 437, p. 448.) The court specifically instructed the jury that they were the judges of the facts proved, of the credibility of the witnesses and the weight to be given to their testimony.

The seventeenth paragraph of the court's charge fully covered appellant's special charge No. 4 on that subject, and it was unnecessary to give said special charge. The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 25, 1915.—Reporter.]