ACCEPTED
03-14-00734-CR
7792859
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/12/2015 10:01:29 AM
JEFFREY D. KYLE
CLERK

NO. 03-14-00734-CR

IN THE COURT OF APPEALS

OF THE THIRD DISTRICT OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/12/2015 10:01:29 AM
JEFFREY D. KYLE
Clerk

BRUCE WAYNE HARKEY,

Appellant

v.

THE STATE OF TEXAS

Appellee

Appeal in Cause No. 5731 in the
33rd Judicial District Court of San Saba County, Texas

## Brief For Appellee

OFFICE OF DISTRICT ATTORNEY
33RD and 424th JUDICIAL DISTRICTS
Wiley B. McAfee, District Attorney
P. O. Box 725, Llano, Texas 78643
Telephone          Telecopier
(325) 247-5755     (325) 247-5274
g.bunyard@co.llano.tx.us

By: Gary W. Bunyard
    Assistant District Attorney
    State Bar No. 03353500
    ATTORNEY FOR APPELLEE

November 12, 2015

*Oral Argument Requested*

## *Identity Of The Parties*

Trial Court

> Honorable J. Allan Garrett
> 33rd Judicial District
> Burnet County Courthouse Annex (North)
> 1701 East Polk St., Suite 74
> Burnet, TX 78611

State/Appellee

> Wiley "Sonny" McAfee                 (Pre-trial and Trial Counsel)
> District Attorney
> 1701 E. Polk, Suite 24
> Burnet, Texas 78611
> (512) 756 - 5449
> State Bar No. 13318020
>
> Anthony J. "Tony" Dodson          (Pre-trial and Trial Counsel)
> Assistant District Attorney
> P. O. Box 725
> Llano, Texas 78643
> (325) 247-5755
> State Bar No. 05927200
>
> Peter Keim                                       (Trial Counsel)
> Assistant District Attorney
> 1701 E. Polk, Suite 24
> Burnet, Texas 78611
> (512) 756 - 5449
> State Bar No. 15532500

Gary W. Bunyard                           (Appellate Counsel)
Assistant District Attorney
P. O. Box 725
Llano, Texas 78643
(325) 247-5755
State Bar No. 03353500
g.bunyard@co.llano.tx.us


Appellant

Donald Rudolph "Rudy" Taylor      (Pre-trial [7/8/2013] Counsel)
P.O. Box 1045
Edin, Texas 76837
State Bar No. 24039498

Richard D. Davis                          (Pre-trial and Trial Counsel)
P.O. Box 398
Burnet, TX 78611
State Bar No. 05537100

Tommy Adams                              (Pre-trial and Trial Counsel)
1901 Vincent
Brownwood, Texas 76801
State Bar No. 00885200

Barton Thomas Vana                    (Pre-trial and Trial Counsel)
101 Highway 281 North, Suite 205C
Marble Falls, Texas 78654
State Bar No. 24084441

Richard D. Davis                          (Appellate Counsel)
P.O. Box 398
Burnet, TX 78611
State Bar No. 05537100
rdd@austin.twcbc.com

Keith S. Hampton  (Appellate Counsel)
1103 Nueces Street
Austin, TX 78701
State Bar No. 08873230
keithshampton@gmail.com

Bruce Wayne Harkey  (Appellant)
TDCJ #01924278
SID #04505208
Allan B. Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

# Table Of Contents

Page

Index of Authorities...................................................................................... vii

Statement of the Case................................................................................... 1

Statement on Oral Argument....................................................................... 1

Response to Issues Presented........................................................................ 2

Statement of the Facts.................................................................................. 3

Summary of the Argument - Response to Issue No. 1............... 9

The record contains corroborating evidence of an
incriminating nature that tends to connect Appellant
to the murder of Karen Johnson.

Summary of the Argument - Response to Issue No. 2............... 9

The record contains corroborating evidence of an
incriminating nature that tends to connect Appellant
to the murder of Bonnie Harkey.

Argument on Response to Issue No. 1 and Issue No. 2

1.1 and 2.1   *Principals of Law*...................................................... 11

1.2 and 2.2   *Applicable Facts*....................................................... 14

1.3 and 2.3   *Discussion and Conclusion*...................................... 24

Summary of the Argument - Response to Issue No. 3................ 30

Admission of extraneous acts of bad conduct was proper
because the acts of bad conduct were material and relevant
to show Appellant's continuing scheme, motive, intent
to engage in a conspiracy, and in rebuttal of Appellant's defenses.

Argument on Response to Issue No. 3...........................................

3.1   Principals of Law................................................... 31

3.2   Applicable Facts................................................... 35

3.3   Discussion and Conclusion....................................... 40

Summary of the Argument - Response to Issue No. 4................ 45

The State is not required to adhere to a ritualistic form to
comply with TRE Rule 404(b). A copy of a statement
referencing the extraneous bad act is sufficient to provide
notice under the rule. In addition this evidence was in
fact same transaction contextual evidence.

Argument on Response to Issue No. 4...........................................

4.1   Principals of Law................................................... 46

4.2   Applicable Facts................................................... 49

4.3   Discussion and Conclusion....................................... 53

Prayer for Relief...................................................................... 56

Certificate of Word Count........................................................ 56

Certificate of Service............................................................... 57

# Index Of Authorities

Case Law                        Page

*Attwood v. State*, 509 S.W.2d 342 (Tex. Crim. App. 1974)....    12

*Bass v. State*, 270 S.W.3d 557 (Tex. Crim. App. 2008).........    33

*Bryant v. State*, 471 S.W.2d 66 (Tex. Crim. App. 1971).........    32

*Dalrymple v. State*, 366 S.W.2d 576 (Tex. Crim. App. 1963).    11

*Grayson v. State*, 481 S.W.2d 859 (Tex. Crim. App. 1972)....    32

*Hayden v. State*, 66 S.W.3d 269 (Tex. Crim. App. 2001)........    46

*Hernandez v. State*, 176 S.W.3d 821
    (Tex. Crim. App. 2005).....................................................    47

*Holladay v. State*, 709 S.W.2d 194 (Tex. Crim. App. 1986)...    12, 13

*Holmes v. State*, 70 Tex. Crim. 423, 157 S.W. 487 (1913).....    12

*Jones v. State*, 481 S.W.2d 900 (Tex. Crim. App. 1972).........    32

*Luquis v. State*, 72 S.W.3d 355 (Tex. Crim. App. 2002)........    34

*Mann v. State*, 718 S.W.2d 741 (Tex. Crim. App. 1986).......    49

*Mayes v. State*, 816 S.W.2d 79 (Tex. Crim. App. 1991).........    48

*Mitchell v. State*, 650 S.W.2d 801 (Tex. Crim. App. 1983),
    *cert. den.* 464 U.S. 1073, 79 L. Ed. 2d 221, 104 S. Ct. 985.    11, 12

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App.
    1991)(opinion on rehearing)............................................    31, 32, 33, 34

*Montoya v. State*, 810 S.W.2d 160 (Tex. Crim. App. 1989), cert. denied, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991)....... 14

*Paulus v. State*, 633 S.W.2d 827(Tex. Crim. App. 1982)........ 12

*Perkins v. State*, 450 S.W.2d 855 (Tex. Crim. App. 1970)...... 12

*Pitts v. State*, 916 S.W.2d 507 (Tex. Crim. App. 1996)......... 46

*Powell v. State*, 63 S.W.3d 435 (Tex. Crim. App. 2001)......... 33

*Reed v. State*, 744 S.W.2d 112 (Tex. Crim. App. 1988).......... 13

*Reynolds v. State*, 489 S.W.2d 866 (Tex. Crim. App. 1972).... 12

*Rogers v. State*, 461 S.W.2d 399 (Tex. Crim. App. 1970)........ 12

*Rose v. State*, 752 S.W.2d 529 (Tex. Crim. App. 1987) (plurality opinion)................................................................. 34

*Sauceda v. State*, 129 S.W.3d 116 (Tex. Crim. App. 2004)....... 49

*Simmons v. State*, 282 S.W.3d 504 (Tex. Crim. App. 2009)..... 13

*Smith v. State*, 332 S.W.3d 425 (Tex. Crim. App. 2011)......... 13

*Swarb v. State*, 125 S.W.3d 672 (Tex. App.--Houston [1st Dist.] 2003, pet. dism'd)................................................ 49

*Washburn v. State*, 167 Tex. Crim. 125, 318 S.W.2d 627, 634 (Tex. Crim. App. 1958)................................................ 11

*Worthy v. State*, 312 S.W.3d 34 (Tex. Crim. App. 2010)........ 48

Constitutions

None cited

Statutes/Rules

Tex. Penal Code Sec. 7.02 (b).................................................. 14

Tex. R. App. Proc. Rule 38.1(d)............................................ 1

Tex. R. App. Proc. Rule 44.2(b)............................................ 47

Tex. R. App. Pro. Rule 81(b)(2)............................................ 33

Tex. R. Evid. Rule 401........................................................ 31

Tex. R. Evid. Rule 403........................................................ 34

Tex. R. Evid. Rule 404 (a)................................................... 30

Tex. R. Evid. Rule 404 (b).......................................... 33, 46, 47, 48

Treatises/Publications

Tex.Jur.2d Evidence, § 195................................................ 32

## Statement Of The Case

Appellant has adequately described the Statement of the Case under the provisions of Rule 38.1(d) Tex. R. App. Proc.

## Statement on Oral Argument

The undersigned requests Oral Argument. While the undersigned does not believe that Oral Argument will be beneficial for this case for the reason that the issues are straight forward and lack any novel or complex nuances, Appellant has requested Oral Argument. Should the Court believe that Oral Argument will assist the Court in any way, the undersigned will gladly accommodate the Court.

## *Response To Issues Presented*

<u>Response To Issue One</u>: The record contains corroborating evidence of an incriminating nature that tends to connect Appellant to the murder of Karen Johnson.

<u>Response To Issue Two</u>: The record contains corroborating evidence of an incriminating nature that tends to connect Appellant to the murder of Bonnie Harkey.

<u>Response to Issue Three</u>: Admission of extraneous acts of bad conduct was proper because the acts of bad conduct were material and relevant to show Appellant's continuing scheme, motive, intent to engage in a conspiracy, and in rebuttal of Appellant's defenses.

<u>Response to Issue Four</u>: The State is not required to adhere to a ritualistic form to comply with TRE Rule 404(b). A copy of a statement referencing the extraneous bad act is sufficient to provide notice under the rule. In addition this evidence was in fact same transaction contextual evidence.

2

# Statement Of The Facts

Appellant has not fully described the facts of this case.

Victim, Bonnie Harkey, and her predeceased husband, Riley Harkey, had acquired a substantial and well known pecan farm, most of which was owned by Riley prior to his marriage to Bonnie. RR Vol. 7 Page 65. Riley Harkey had two sons by a prior marriage, John Harkey and Bruce Harkey (Appellant). RR Vol. 7 Page 65. Bonnie Harkey had one predeceased daughter, Connie Ballinger. RR Vol. 7 Page 66. Connie Ballinger had one adopted son, Carl Pressley (co-defendant). RR Vol. 7 Page 66. The Will of Riley Harkey provided for a Life Estate to Bonnie Harkey to the entire pecan estate. RR Vol. 7 Page 79. The Will further provided that upon the death of Bonnie Harkey, as to one portion of the pecan estate, the Prichard Orchard, a Life Estate would then pass to Connie Ballenger with a remainder to Carl Pressley while as to the other portion of the pecan estate, the Harkeyville Orchard and the Home Place Orchard, a Life Estate would then pass to John Harkey and Appellant with a remainder to the children of John and Appellant. RR Vol. 7 Pages 92 - 94; RR Vol. 13 State's Exhibit 8.

Following the death of her husband, Bonnie Harkey began to suffer from dementia to the point that a guardianship of her person and of her estate was

3

established. RR Vol. 7 Page 63. Connie Ballenger was first appointed as guardian of the person and of the estate of Bonnie Harkey. RR Vol. 7 Page 62. In 2011 Connie Ballenger died and Darrel Spinks was appointed as temporary successor as guardian of the person and of the estate. RR Vol. 7 Page 62. Because of Bonnie Harkey's dementia, she required the services of three care givers rotating on a 24 hour a day basis. RR Vol. 7 Page 136.

Upon his appointment Darrel Spinks refused to approve a proposed sale of in excess of 65 acres of one section of the farm that John Harkey and Appellant wanted sold. RR Vol. 7 Pages 74 - 75, 77 - 80. Later, in August 2011, Darrell Spinks became permanent guardian of the estate of Bonnie Harkey while Betty Johnson was appointed as permanent guardian of the person of Bonnie Harkey. RR Vol. 7 Pages 85 - 87. With terms then modified, Darrell Spinks at this point approved the sale by John Harkey and Appellant of approximately 88 acres of the Home Place Orchard to a third party with John and Bruce receiving the sales proceeds. RR Vol. 7 Pages 90 - 91. The remaining portion of the Home Place Orchard, including the residence, became the permanent separate property of Bonnie by agreement of the parties involved. RR Vol. 7 Page 80.

Also in August 2011 Carl Pressley sold his future interest in the Prichard Orchard to John Harkey and Appellant for $70,000. RR Vol. 7 Pages 95 - 96, 232.

4

Just prior to this sale, Appellant was negotiating with famed actor Tommy Lee Jones to sell the Prichard Orchard for close to $600,000. RR Vol. 7 Pages 97 - 99. However, Darrell Spinks refused to relinquish Bonnie Harkey's Life Estate in the Prichard Orchard and this anticipated sale did not occur. RR Vol. 7 Pages 99 - 103. The contractual closing of this sale was to be April 12, 2012. RR Vol. 7 Page 111.

During this period where Darrell Spinks was guardian of the estate of Bonnie Harkey, Appellant was frequently complaining about the manner in which Spinks was running the farm, being outright hostile to Spinks. RR Vol. 7 Pages 109 - 110. Appellant complained that Spinks was interfering with Appellant's legacy. RR Vol. 7 Page 110. Appellant would often refer to the pecan orchards as his estate and his trees. RR Vol. 7 Page 133.

Appellant has held a dislike of Bonnie Harkey from the time that she married Riley Harkey. RR Vol. 13 State's Exhibit 108 (See State's Exhibit 109 Pages 117 - 118). Appellant has told various persons who were acquainted with Appellant but not otherwise confidants, things like:

1. "....he wished the bitch was dead where he could get his part and go to Belize." RR Vol. 9 Page 56.

2. "On one hand he would say that he did care for Bonnie Harkey, and then in reverse of that he would turn around and say that he couldn't stand her, and he hated her, and she needed to die." RR Vol. 10 Page 19.

5

3. "The most anger that I saw that was in reference to the land. It was his land. It was in his family. It wasn't the Pressleys' land. It wasn't Bonnie's land." RR Vol. 10 Page 24.

4. "He said that he was ready to take control of his property." " That she needed to die, or that she needed to be out of her right mind." RR Vol. 10 Pages 38 - 39.

5. "He called her an old bitch and said he couldn't believe the old bitch didn't have the decency to die." RR Vol. 10 Page 56.

6. "I could have pushed her off of a riverbank and nobody would have even known anything. I could have dropped a pecan tree on her, for God's sake." and "I used to go into her bedroom and check on her. She'd be laying up in bed. (Snoring noise) You know, all I had to do was put a pillow over her face and she was gone." RR Vol. 13 State's Exhibit 112 (refer to State's exhibit 113 for transcript).

About a week prior to March 26, 2012, Appellant instructed co-defendant Carl Pressley that the use of a pillow to suffocate Bonnie Harkey would make sure that no fingerprints or evidence was left after the murder. RR Vol. 7 Page 226. On Friday, March 23, 2012, Appellant paid co-defendant, Carl Pressley, $100, with more to be deposited into Pressley's bank account, to kill Bonnie Harkey. RR Vol. 7 Page 210. Appellant wanted the murder to be committed during that weekend. RR Vol. 7 Page 211.

Pressley went to the residence of Bonnie Harkey on March 25, 2012. RR Vol. 7 Page 215. Pressley entered the residence through a window and hid. RR

6

Vol. 7 Page 216. Pressley sent his wife a text and then his wife rang the door bell. RR Vol. 7 Page 220. When the door bell rang Pressley began making his way toward the door. RR Vol. 7 Page 222. Pressley went past Bonnie Harkey and attacked Bonnie's caretaker, Karen Johnson. RR Vol. 7 Page 223 - 224. Once Karen Johnson was dead, Pressley went into Bonnie Harkey's bedroom to get a pillow with the intent to suffocate Bonnie Harkey. RR Vol. 7 Page 226. Pressley walked Bonnie Harkey to her bedroom, asked her to pray with him, and then placed the pillow over Bonnie Harkey's face. RR Vol. 7 Pages 227 - 228.

Pressley was interrupted at which time he walked Bonnie Harkey to the garage and placed her into the car. RR Vol. 7 Pages 228 - 230. Pressley and his wife, Lillian King, drove Bonnie Harkey to Hilltop Lakes near Normangee in Leon County, where Pressley and King were living. RR Vol. 7 Page 236. After taking Bonnie Harkey to the park's community restroom, Pressley walked Bonnie down to the creek bed. RR Vol. 7 Pages 237 - 238. There Pressley hit Bonnie in the head and then held her head down in the mud until she drowned. RR Vol. 7 Page 239. Pressley covered the body with leaves and then burned his clothing and the seat cover from the car. RR Vol. 7 Page 240.

During the time of the murders, Appellant was in Fort Worth with his brother because Appellant did not want to directly participate. RR Vol. 7 Pages 240 - 241.

The day after the murders, Pressley and King returned to San Saba at the request of Sheriff Brown.  RR Vol. 7 Pages 250 - 251.  Upon arrival Pressley promptly confessed to the murders of Bonnie Harkey and Karen Johnson and included in his statement Appellant's participation.  RR Vol. 7 Pages 251 - 254.

## Summary Of The Argument on
## Response to Issue No. 1 and Issue No. 2

**The record contains corroborating evidence of an incriminating nature that tends to connect Appellant to the murder of Karen Johnson.**

**The record contains corroborating evidence of an incriminating nature that tends to connect Appellant to the murder of Bonnie Harkey.**

Appellant complains that there is no evidence in the record that corroborates any of the accomplice witness testimony and tends to connect Appellant to the murder of either Karen Johnson or Bonnie Harkey. Appellant does not dispute the evidence that Carl Pressley, with the assistance of Lillian King, murdered Karen Johnson and then kidnapped Bonnie Harkey, drove her to Leon County, and held her head in the mud until she drowned. The State's theory at trial was that Appellant aided, assisted, encouraged and otherwise conspired with Carl Pressley to murder Bonnie Harkey and that Appellant knew or should have known that the care giver on duty would have been murdered during the course of the attempted murder and

subsequent kidnapping and murder of Bonnie Harkey. The record does contain independent evidence of Appellant's hatred of Bonnie Harkey both before and after the murders, Appellant's monetary payment to Carl Pressley shortly before the murders, Appellant's unusual comments shortly before the murders to several mere acquaintances that he was leaving town for the weekend, Appellant's odd phone call to the Sheriff's Office the day before the murders stating that he was in Fort Worth and requesting a welfare check, Appellant's description of his conversation with John Harkey about hoping Bonnie Harkey was found floating face down in a river, Appellant's knowledge that Bonnie Harkey required the assistance of a full-time caretaker, and the proximity of the murders in time as compared to the proposed date of closing on the sale of land to Tommy Lee Jones.

## Argument On Response to Issue No. 1 and Issue No. 2

### 1.1 and 2.1    Principals of Law

The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. *Dalrymple v. State*, 366 S.W.2d 576 (Tex. Crim. App. 1963).

In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances.   *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983), *cert. den.* 464 U.S. 1073, 79 L. Ed. 2d 221, 104 S. Ct. 985.

All the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. *Washburn v. State*, 167 Tex. Crim. 125, 318 S.W.2d 627, 634 (Tex. Crim. App. 1958).

The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission

of the offense supplies the test. *Perkins v. State*, 450 S.W.2d 855 (Tex. Crim. App. 1970).

It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Attwood v. State*, 509 S.W.2d 342 (Tex. Crim. App. 1974).

Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony. *Holmes v. State*, 70 Tex. Crim. 423, 157 S.W. 487 (1913); *Paulus v. State*, 633 S.W.2d 827, 844 (Tex. Crim. App. 1982).

Evidence which merely goes to show motive or opportunity of the accused to commit the crime is insufficient alone to corroborate the accomplice witness. It may, however, be considered in connection with other evidence tending to connect the accused with the crime. *Paulus v. State*, 633 S.W.2d 827, 846 (Tex. Crim. App. 1982); *Mitchell v. State*, 650 S.W.2d 801, 808 (Tex. Crim. App. 1983), *cert. den.* 464 U.S. 1073, 79 L. Ed. 2d 221, 104 S. Ct. 985; *Reynolds v. State*, 489 S.W.2d 866 (Tex. Crim. App. 1972); *Rogers v. State*, 461 S.W.2d 399 (Tex. Crim. App. 1970).

The State is not required to present corroborating evidence to prove any specific element of the charge, only to present corroborating evidence that tends to connect the accused with that offense. *Holladay v. State*, 709 S.W.2d 194 (Tex. Crim. App.

1986). As to whether the evidence adduced is sufficient to corroborate the testimony of the accomplice witness, such must, of course, be decided on an ad hoc basis. *Holladay*, supra at 200.

When reviewing the sufficiency of non-accomplice evidence under Tex. Code Crim. Proc. Ann. art. 38.14, an appellate court decides whether the inculpatory evidence tends to connect the accused to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Smith*, supra at 442; *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). When there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—the reviewing court will defer to the fact finder's resolution of the evidence. *Smith*, supra at 442; *Simmons*, supra at 508. It is not appropriate for appellate courts to independently construe the non-accomplice evidence. *Smith*, supra at 442; *Simmons*, supra at 509.

A defendant's attitude and behavior, both before and after the crime, can be considered as an independent circumstance that tends to connect the defendant to the crime. *Smith*, supra at 445.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Tex. Penal Code Sec. 7.02 (b).

Such theories of culpability may be appropriately applied in a capital murder setting. <u>Montoya v. State</u>, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989), cert. denied, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).

### 1.2 and 2.2   Applicable Facts

Appellant does not dispute the fact that Carl Pressley and Lillian King killed Karen Johnson and Bonnie Harkey or the manner and means in which each were murdered. RR Vol. 7 Pages 191, 252; RR Vol. 8 Pages 33 - 37. At issue is whether the record contains any evidence that corroborates the testimony of Carl Pressley and/or Lillian King and such evidence is of an incriminating nature and tends to connect Appellant to either or both murders.

The record contains substantial evidence of Appellant's hatred for his step-mother. Appellant told Texas Ranger De La Garza that Appellant's father married

Bonnie Harkey approximately 5 weeks after his divorce from Appellant's mother. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Pages 117 - 118. A month later, when Appellant was 11 years old, Bonnie told Appellant's father that if he did not get rid of Appellant Bonnie was going back to Waco. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Page 118. Appellant held a great deal of resentment against Bonnie Harkey. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Page 118; RR Vol. 10 Page 56 (He called her an old bitch and said he couldn't believe the old bitch didn't have the decency to die.); RR Vol. 8 Page 76; RR Vol. 8 Pages 52 - 55 (And he said that Bonnie Harkey was taking care of the (Appellant's) child, the child was dead -- or the child was taken to the hospital and was found to be deceased. And he told me it was from the child basically choking on its food because Bonnie did not take care of the child the way she was supposed to.); RR Vol. 7 Page 64 (He came into the kitchen in the auction and told me he wanted me to put Bonnie in a nursing home because he wanted he and his wife to move in the house.); RR Vol. 9 Page 56 (And I don't even know how the conversation started or where we were, but he made the comment that -- something had come up about Bonnie, and he said he wished the bitch was dead where he could get his part and go to Belize.); RR Vol. 7 Page 194 (He said he was tired -- pretty much tired of dealing with her. Said he just wished the old bitch would die.)(I then said something to him about that I

thought that was inappropriate or the wrong thing to say, and he totally apologized. He said, "You just don't understand. That lady killed my son, and she's ruining my inheritance."); RR Vol. 7 Page 89 (Bruce often referred to Bonnie as a whore and prostitute.).

Collateral to Appellant's overall hatred of Bonnie Harkey, a substantial amount of evidence was developed that Appellant was of the opinion that Bonnie Harkey was not entitled to the Harkey Estate that was developed by his father, Riley, and that the Estate belonged to him. RR Vol. 7 Page 110 (Yeah, he called it his legacy.); (Appellant felt like Bonnie Harkey and Darrell Spinks were standing in the way of his legacy); RR Vol. 7 Page 133 (Just constantly being threatened about litigation, "You're devaluing the estate. You're killing my trees."); RR Vol. 10 Page 24 (The most anger that I saw that was in reference to the land. It was his land. It was in his family. It wasn't the Pressleys' land. It wasn't Bonnie's land.); RR Vol. 10 Pages 38 - 39 (He said that he was ready to take control of his property)(That she needed to die, or that she needed to be out of her right mind.).

For quite some time Appellant was feuding with Darrell Spinks, the Guardian of the Estate of Bonnie Harkey, over the management of the pecan orchards as well as Appellant's efforts to have two sections of the orchards sold with the proceeds to go to Appellant and his brother, John Harkey. This included a dispute over Darrell

Spinks initially refusing to approve the sale of a 65.94 acre tract because the majority of the sales proceeds was to go to Appellant and John Harkey. RR Vol. 7 Pages 73 - 75. Appellant and his brother, John, threatened on numerous occasions to sue Bonnie Harkey for "back rents and basically threatened to sue her for monies derived from that property. The grazing leases, farming leases, they were threatening to sue her for that over all those years that she had managed the property." RR Vol. 7 Page 79. At one point Appellant attempted to secure the services of Jason Sandlin to beat Spinks up to prevent Spinks from testifying in court. RR Vol. 9 Page 110. Appellant offered Sandlin a new Harley Davidson motorcycle for this service. RR Vol. 9 Pages 112 - 113.

On March 23, 2012, the Friday before the death of Bonnie Harkey , Appellant paid Carl Pressley $100 in cash, with more to be transferred into Pressley's account, to kill Bonnie Harkey. RR Vol. 7 Page 210. On March 22, 2012, the day before this payment, Lorretta Waller, the mother of Lillian King, drove Pressley and King to Appellant's house. RR Vol. 9 Pages 63 - 64. Appellant brought Pressley back to Lorretta Waller's house. RR Vol. 9 Page 65. During this period Ms. Waller overheard Pressley talking on the phone saying that he needed $100 and later talking on the phone saying that he needed $250 if the other person of the conversation wanted something done. RR Vol. 9 Page 68. A few minutes after the first phone

call Appellant came over to Lorretta Waller's house at which time Pressley went out to meet with Appellant and then returned with $100. RR Vol. 9 Pages 69 - 70. This transaction occurred on the Friday preceding the death of Bonnie Harkey. RR Vol. 9 Page 70. The phone call involving the $250 occurred either on that Friday evening or on Saturday. RR Vol. 9 Pages 70 - 73. San Saba County Deputy John Wilkerson testified that the bank records of Appellant and Jennifer Harkey, previously admitted as State's Exhibit 37, showed that a withdrawal of $200 was made from that account on Friday, March 23, 2012. RR Vol. 8 Pages 77, 79 - 80. Deputy Wilkerson interviewed Appellant who acknowledged giving Pressley $100 on March 23, 2012. RR Vol. 8 Page 80.

The record further shows that Appellant, according to his bank account, was running low on funds and had very little income during the months leading up to the murders with the exception of one deposit of $100,000 in August 2011. RR Vol. 8 Pages 77 - 79; RR Vol. 13 State's Exhibit 37. This large deposit occurred on August 5, 2011, when Appellant and his brother, John, sold a parcel of 22.32 acres to Triple M Cattle Company and a parcel of 65.94 acres to John and Carol Martin. RR Vol. 13 State's Exhibit 11; State's Exhibit 12. Appellant and John acquired these parcels from the Harkey Estate as part of a mediated settlement agreement with Darrell Spinks. RR Vol. 7 Page 85.

Following this acquisition and sale, Appellant and John coerced Pressley into selling them his future remainderman interest in the Prichard Orchard for $15,000 down. RR Vol. 7 Pages 93 - 96; Vol. 13 State's Exhibit 108; State's Exhibit 109 Pages 244 - 245. The $15,000 down payment was comprised of $7,500 each from Appellant and John, the cash being paid out of the funds received from the sale of the 22.32 acre tract and the 65.94 acre tract, with an unsecured promise of additional payments of $10,000 per year for five years, the total purchase price being $70,000. RR Vol. 7 Page 96; Vol. 13 State's Exhibit 108; State's Exhibit 109 Page 243. At the same time, Appellant and John were negotiating with famed actor Tommy Lee Jones to sell the Prichard Orchard for $576,000. RR Vol. 7 Page 50; Pages 100 - 101. The contractual closing date for the sale to Tommy Lee Jones was for April 23, 2012. RR Vol. 13 State's Exhibit 13.

Carl Pressley testified that Appellant wanted the murder of Bonnie Harkey to occur on the weekend of March 28, 2012. RR Vol. 7 Page 211. On March 1, 2012, Appellant placed an order for specialty caps with San Saba Printing. RR Vol. 9 Page 34. On March 23, 2012, Appellant went to San Saba Printing and asked for one of the caps to be completed that day stating that he was going to a golf tournament in Dallas that weekend. RR Vol. 9 Page 35. Appellant told the general manager of San Saba Printing, Jack Vaughn, that he was going to leave early

Saturday morning, and he wouldn't be back in until late Sunday night or maybe even Monday morning before he was in. RR Vol. 9 Page 38. Mr. Vaughn thought it was odd that Appellant stated this twice, like Appellant was trying to stress it. RR Vol. 9 Page 39. Mr. Vaughn testified, "I couldn't understand why it was -- it was almost humorous that it was -- that he was stating so strongly he was going to be gone from Saturday morning early until late Sunday night at least." "He stressed 'all weekend'"; "that's why I stressed 'all weekend.'" "He stressed so much he was going to be gone all weekend long." RR Vol. 9 Page 39 - 40. Mr. Vaughn testified that Mr. Harkey's interactions on that day were different from the previous time that Mr. Harkey conducted business with San Saba Printing. RR Vol. 9 Page 43. Mr. Vaughn thought this to be so odd that he mentioned to his wife several hours later and then contacted the Sheriff's Office when he had heard about the murders. RR Vol. 9 Pages 44 - 47.

On Wednesday, March 21, 2012, Appellant brought a trailer to the tractor repair shop belonging to Tommy Johnson requesting that Mr. Johnson "wire up" the trailer so it can be used to haul wood to a barbeque place. RR Vol. 10 Page 53. The wiring job on the trailer was completed on Thursday but Appellant's pickup was needed to complete the wiring job. RR Vol. 10 Page 54. On Friday, when Appellant returned, Appellant was dressed up nice stating that he was behind

schedule and needed to get out of town. RR Vol. 10 Page 58. Appellant also told

several people at the shop, including Mr. Johnson, that he was going to Fort Worth

to play golf with his brother as he sometimes does. RR Vol. 10 Pages 56 - 57.

Appellant repeated this multiple times and in the exact language each time. RR Vol.

10 Pages 56 - 57. Appellant also told Mr. Johnson, referring to Bonnie Harkey, he

"couldn't believe the old bitch didn't have the decency to die." RR Vol. 10 Page 56.

While at the repair shop on Friday after lunch, Mr. Johnson overheard Appellant

making a phone call to someone checking on a job. RR Vol. 10 Page 58. Following

the testimony of Mr. Johnson, the State called Louann Turner who is in charge of

senior citizen's centers for nine counties. RR Vol. 10 Page 73. On March 5, 2012,

Appellant applied for a job in the San Saba senior citizen's center. RR Vol. 10 Page

74. On that date Appellant brought the application to Ms. Turner's office and

visited with her. RR Vol. 10 Page 74. At that time Ms. Turner informed Appellant

that she was going to hire someone within the next week. RR Vol. 10 Page 76. On

Friday, March 23, 2012, Appellant called Ms. Turner's office after hours and left a

voice message stating it was Friday and that he was going to be out of town until

probably Monday in case she needed to get hold of him. RR Vol. 10 Pages 77 - 79.

The jury heard evidence from Jason Sandlin that on Saturday night, the day prior

to the murder, Carl Pressley called Sandlin's phone and left a recording that stated

21

that Bonnie Harkey was dead. RR Vol. 9 Page 115. Sandlin in turn phoned

Appellant to express Sandlin's condolences for the death of Appellant's mother. RR

Vol. 9 Page 116. Appellant seemed surprised at this news and told Sandlin that

Appellant was going to call the sheriff's department to have them do a welfare check.

RR Vol. 9 Page 117. In Appellant's statement to Ranger De La Garza Appellant

stated on this topic:

> "I'm the guy that called the sheriff's office last Saturday night and said,
> "Something's not right. I just got a phone message that said that Bonnie Harkey's
> dead." "We've got no, no, no way of doing what" -- "Can you check? What -- I'm
> smelling a rat here, guys. Okay. I'm not here. I can't go look and see. Get off your
> dead ass and go look." They wouldn't go look. They said, "Oh, no. Uh. We'll call
> the sheriff." "Please do. Will you call me back?" "Well, Mr. Harkey, we won't
> promise anything."

RR Vol. 13 State's Exhibit 108; Exhibit 109 Pages 126 - 127.

During the trial, evidence was admitted in which Appellant made statements to

Texas Ranger Andres De La Garza describing how he and his brother John were

talking, after being told by authorities that Bonnie Harkey was missing but before

being told she was deceased, about hoping Bonnie Harkey was sitting on the river

bank somewhere and hoping that she would be found floating face down in the

river. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Pages 238 - 239.

Also admitted were phone records of Appellant and Carl Pressley. RR Vol. 13

State's Exhibit 66; RR Vol. 9 Pages 157, 159. In his testimony, Pressley testified that

he called Appellant around 6:00 p.m., a time after Pressley had kidnapped Bonnie Harkey but before her death. The cell phone records show a call from Pressley's cell phone to Appellant's cell phone at 6:12 p.m. during which the parties talked for 2:04 minutes. RR Vol. 13 State's Exhibit 66. Around dusk Pressley walked Bonnie Harkey to the creek where he struck her on the head and then held her face in the mud until she was dead. RR Vol. 7 Pages 238 - 239. The cell phone records show a call from Pressley's cell phone to Appellant's cell phone at 8:55 p.m. for a duration of 36 seconds. RR Vol. 13 State's Exhibit 66.

Appellant also stated to Ranger De La Garza "I used to go into her bedroom and check on her. She'd be laying up in bed. (Snoring noise) You know, all I had to do was put a pillow over her face and she was gone." RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Page 266.

In regard to Karen Johnson, Appellant told Ranger De La Garza that Bonnie Harkey suffered from dementia. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Page 245. Appellant further stated that Bonnie Harkey had a guardian. RR Vol. 13 State's Exhibit 108; State's Exhibit 109 Pages 253 - 254. Darrell Spinks testified that he was appointed as guardian of the estate of Bonnie Harkey in March 2011. RR Vol. 7 Page 62. Connie Ballenger was the guardian of the person and of the estate of Bonnie Harkey prior to the appointment of Spinks. RR Vol. 7 Page 73.

The reason for this appointment was that Bonnie suffered from dementia and required 24-hour care givers at the house. RR Vol. 7 Page 63. Betty Ann Johnson was appointed as the guardian of the person of Bonnie Harkey in March 2011. RR Vol. 7 Page 86. Appellant had participated in mediation proceedings related to the Estate of Bonnie Harkey. RR Vol. 7 Pages 73 - 74. For a short time Appellant was employed to work on the Harkey pecan farm. RR Vol. 7 Page 104.

Darrell Spinks testified that Bonnie Harkey had three care givers who worked to care for her on a rotating shift covering 24 hours each day, seven days a week. RR Vol. 7 Page 136. Appellant had various arguments with Spinks over Bonnie not being put in a nursing home. RR Vol. 7 Pages 136 - 137. One of the reasons cited by Appellant for placing Bonnie in a nursing home was that she was not getting the care that she needed at home with the care givers. RR Vol. 7 Pages 136 - 137.

Carl Pressley testified that Appellant was aware that a care giver would be present and instructed Pressley to "kill everybody". RR Vol. 7 Pages 214 - 215.

## 1.3 and 2.3  Discussion and Conclusion

In this case the jury had ample evidence with which they could, if they believed the evidence and made reasonable deductions therefrom, come to the conclusion that Appellant believed that the Harkey Estate should be his, that Bonnie Harkey

24

had no legitimate claim to any part of the Harkey Estate, and that Appellant's financial situation was dwindling. A rational jury could decide from this Appellant's motive and state of mind.

Evidence was admitted that a rational jury could believe corroborated the testimony of Carl Pressley and Lillian King that amounted to a combination of suspicious circumstances. A rational jury could conclude that Appellant's statement to Ranger De La Garza that had Appellant wanted to kill Bonnie Harkey all he would have had to do would "put a pillow over her face and she was gone" corroborated Carl Pressley's testimony that Appellant had instructed Pressley that using a pillow to kill Bonnie would not leave fingerprints and thereby, setting aside all accomplice witness testimony, is incriminating in nature and tends to connect Appellant to the crime. The same would apply to Appellant's statement to Ranger De La Garza that, after receiving news of Bonnie's disappearance but before receiving news that Bonnie's body had been found, Appellant and his brother, John, had talked about hoping Bonnie would be found sitting on a riverbank and hoping Bonnie would be found floating face down in a river.

From common experience, a rational jury could conclude that dusk, being the time Pressley walked Bonnie to the creek, in March would be prior to 8:55 p.m. The testimony of Pressley as to the phone call to Appellant at about 6:00 p.m. is

25

corroborated by the cell phone records. From this a rational jury could deduce that Pressley and Appellant had a short discussion about what to do when Pressley arrived with Bonnie Harkey at the RV park in Leon County. Following the murder of Bonnie Harkey, a rational jury could conclude that Pressley informed Appellant at 8:55 p.m. that the murder had been accomplished. Therefore a rational jury could conclude that Appellant had prior knowledge of where and how Bonnie Harkey was murdered. Such evidence corroborated Carl Pressley's testimony that Appellant aided, assisted, encouraged, and conspired with Pressley to murder Bonnie Harkey. Such evidence, setting aside all accomplice witness testimony, is of an incriminating nature and tends to connect Appellant to the crime.

In addition a rational jury could conclude that Loretta Waller's testimony of overhearing Carl Pressley talking on the telephone about needing $100, and Carl Pressley promptly having $100, and San Saba Sheriff's Investigator John Wilkerson's testimony and the bank records exhibit showing that Appellant withdrew $200 on March 23rd, and Appellant's statement to Ranger De La Garza that Appellant did give Carl Pressley $100 on March 23rd could, as a combination, corroborate Carl Pressley's testimony that Appellant paid Pressley $100 as partial compensation to kill Bonnie Harkey. This evidence, setting aside all accomplice witness testimony, is of an incriminating nature and tends to connect Appellant to the crime.

Further, a rational jury could conclude from the testimony of Jack Vaughn, Tommy Johnson, and Louann Turner that Appellant was deliberately stressing to these witnesses that he was leaving San Saba for the weekend in order to establish his alibi and, as such, corroborated the testimony of Carl Pressley that Appellant had wanted Bonnie Harkey killed during that weekend. Setting aside all accomplice witness testimony, this evidence is of an incriminating nature and tends to connect Appellant to the crime.

A rational jury could conclude from Appellant's acknowledged phone call to the San Saba Sheriff's Office on the night before the murder, that Appellant was using this as an opportunity to further establish his alibi for the anticipated murder. A rational jury could also conclude that because Appellant considered Bonnie Harkey as an impediment to his ability to gain control over the estate, Appellant would be more likely to have driven the short distance from Fort Worth to San Saba in order to begin taking immediate possession and control of his legacy had he really believed that Bonnie was actually dead from natural causes. This evidence, setting aside all accomplice witness testimony, is of an incriminating nature and tends to connect Appellant to the crime.

A rational jury could also compare the closing date (April 12, 2012) on the proposed contract to sell the Prichard Orchard to famed actor Tommy Lee Jones

27

with the date of the murder of Bonnie Harkey (March 25, 2012) and determine that the date on the contract further corroborated the testimony of Carl Pressley that Appellant wanted Bonnie killed on that particular weekend. This evidence, setting aside all accomplice witness testimony, is of an incriminating nature and tends to connect Appellant to the crime.

As to the issue of the death of Karen Johnson, the record establishes that Appellant clearly knew the mental condition of Bonnie Harkey and her need for around-the-clock care over a long period of time. The evidence showed that Appellant was at or near Bonnie's house off and on for years. Appellant applied to be appointed as Bonnie's guardian after the death of Connie Ballanger. Appellant made claims against Bonnie's estate, eventually becoming successful in acquiring title to a portion of the pecan farm which Appellant then promptly sold. Appellant even described to Ranger De La Garza that Bonnie needed to be placed in a nursing home because the care givers were not giving Bonnie proper care. A rational jury could conclude that this evidence, as a combination, showed that Appellant anticipated that someone other than Bonnie Harkey would be present when Pressley was to arrive to kill Bonnie and that Appellant was aware that anyone present at that time would likely be seriously injured or killed. A rational jury could thereby conclude that this evidence corroborated the testimony of Carl Pressley that

Appellant had instructed Pressley to "kill everybody". This evidence, setting aside all accomplice witness testimony, is of an incriminating nature and tends to connect Appellant to the crime.

In summary the combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses and exhibits which is both incriminating and tends to connect Appellant with the commission of the offenses gave the jury a better understanding of the true nature of Appellant's motive, Appellant's statements made to law enforcement and acquaintances, Appellant's efforts to establish his alibi, and Appellant's statement to Pat Pierce regarding his hiring of another person to kill Bonnie Harkey.

For these reasons the relief requested by Appellant in his Issue No. 1 and his Issue No. 2 should be denied and the trial court's judgment of conviction and sentence be affirmed.

## Summary Of The Argument on Response to Issue No. 3

**Admission of extraneous acts of bad conduct was proper because the acts of bad conduct were material and relevant to show Appellant's continuing scheme, motive, intent to engage in a conspiracy, and in rebuttal of Appellant's defenses.**

Appellant complains that the trial court erred in admitting evidence of prior extraneous offenses and bad acts committed by Appellant and that such offenses and bad acts merely went to establish character and conformity in violation of Tex. R. Evid. Rule 404 (a). However, this evidence was offered and admitted for the limited purpose of proving Appellant's scheme and Appellant's intent to engage in a conspiracy with Carl Pressley and Lillian King to murder Bonnie Harkey. In other instances such evidence was offered and admitted for the limited purpose of rebutting Appellant's defensive theories. In each instance the trial court instructed the jury on consideration of the evidence only for the purposes stated by the trial court.

## Argument On Response to Issue No. 3

### 3.1  Principals of Law

Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.  Tex. R. Evid. Rule 401.

The adversarial system assigns the question of relevance to the trial judge, on the assumption that he has the best vantage from which to decide.  *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)(opinion on rehearing).  Determining the relevance of any given item of evidence to any given lawsuit is not exclusively a function of rule and logic.  *Id.*  The trial court must rely in large part upon its own observations and experiences of the world, as exemplary of common observation and experience, and reason from there in deciding whether proffered evidence has "any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.;* Tex. R. Evid. Rule 401.

Appellate courts uphold the trial court's ruling on appeal absent an "abuse of discretion." *Id.*  That is to say, as long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede.  *Id.*

31

In the trial of a person accused of a particular crime, it is a general rule that evidence of previous or subsequent commission of other crimes, not connected with that for which he is on trial, is not admissible. *Grayson v. State*, 481 S.W.2d 859 (Tex. Crim. App. 1972). It has been consistently held that an accused is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. *Jones v. State*, 481 S.W.2d 900 (Tex. Crim. App. 1972). However, this general rule has well recognized exceptions and in certain classes of cases extraneous offenses may be shown as part of the "res gestae", or as reflecting upon the mental processes or mental attitude of the accused, where intent, malice or guilty knowledge is an essential element of the crime for which the defendant is on trial, or as throwing light upon the motive inducing the commission of the crime, or to prove identity of the defendant, where identity is an issue, and more especially, where such extraneous offenses have been executed according to a system or method, and it is shown that the accused committed other such offenses and, in so doing, followed the same plan or method as is shown to have been followed in the commission of the crime charged in the indictment. *Bryant v. State*, 471 S.W.2d 66 (Tex. Crim. App. 1971); *Grayson v. State*, 481 S.W.2d at 862; Tex.Jur.2d Evidence, § 195.

Defensive evidence and even a representation in opening statements, can open the door to the admission of extraneous-offense evidence rebut the defensive theory presented by the defense. *Bass v. State*, 270 S.W.3d 557 (Tex. Crim. App. 2008); *Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001).

Where the appellate court can say with confidence that by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then it can be said the trial court abused its discretion to admit that evidence. *Montgomery v. State*, 810 S.W.2d at 391. Where the trial court erred to admit the proffered evidence, the reviewing court should then proceed to determine harmfulness under Tex. R. App. Pro. Rule 81(b)(2). *Id.*

Whether objected-to evidence of "other crimes, wrongs, or acts" has relevance apart from character conformity, as required by Rule 404(b) is also a question for the trial court. *Id.*; Tex. R. Evid. Rule 404 (b). The trial judge must conclude that the evidence tends in logic and common experience to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence. *Id.* An appellate court owes no less deference to the trial judge in making this judgment than it affords him in making any other relevancy call. *Id.*

33

A reviewing court also measures the trial court's ruling whether to exclude evidence of "other crimes, wrongs, or acts" under Rule 403 by an abuse of discretion standard. *Id.*; Tex. R. Evid. Rule 403.

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. Rule 403.

Where relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence, the trial court will have erred in failing to exclude it. *Montgomery*, supra at 392.

The reviewing court will assume that the jury would follow the instruction of the trial court as given, and it will not reverse in the absence of evidence that the jury was actually confused by the charge. See *Rose v. State*, 752 S.W.2d 529, 554 (Tex. Crim. App. 1987)(plurality opinion); *Luquis v. State*, 72 S.W.3d 355, 366 - 367 (Tex. Crim. App. 2002).

## 3.2 Applicable Facts

The primary theory of the State's case at trial was that Appellant conspired with Carl Pressley to murder Bonnie Harkey. RR Vol. 7 Pages 33, 55; Vol. 8 Pages 46, 208; Vol. 9 Pages 11 - 19, 152; Vol. 10 Pages 66 - 67, 120 - 140; Vol. 12 Pages 12, 22, 57 - 58. The motive for the murder of Bonnie Harkey was to gain control of the Harkey Estate. RR Vol. 7 Page 24; Page 194 ("You just don't understand. That lady killed my son, and she's ruining my inheritance."); Vol. 9 Page 56 (....he said he wished the bitch was dead where he could get his part and go to Belize.) Vol. 10 Page 24 (The most anger that I saw that was in reference to the land. It was his land. It was in his family. It wasn't the Pressleys' land. It wasn't Bonnie's land.). Karen Johnson was murdered because she discovered Carl Pressley in the Harkey home as he was attempting to murder Bonnie. RR Vol. 7 Pages 214 - 215; 219 - 224.

Approximately two months prior to trial, Appellant initiated a conversation with fellow inmate, Pat Pierce, regarding the fact that a number of people needed killing. RR Vol. 10 Pages 85 - 88. According to Appellant, San Saba County Sheriff Steve Boyd and Justice of the Peace Les Dawson had threatened Appellant's wife and that was a killing offense to Appellant. RR Vol. 10 Page 88. Also, Jim Childress and Dick Miller were dividing up Appellant's property. RR Vol. 10 Page 88. Appellant offered Pierce a motorcycle if Pierce would kill Sheriff Boyd, Justice of the Peace

Dawson, Jim Childress, and Dick Miller. RR Vol. 10 Page 89 - 91. The trial court instructed the jury:

> "Ladies and gentlemen of the jury, when it comes to any evidence of any other offense that's alleged that this defendant might have committed, through this witness, you're only to consider that testimony if you believe it beyond a reasonable doubt. And then if you do believe it beyond a reasonable doubt, you're to consider it only for the following purposes: As evidence of a continuing scheme, as evidence of motive, or as evidence of intent to engage in a conspiracy, and for no other reasons at that point."

RR Vol. 10 Page 87.

Also the trial court admitted testimony of David Rube, a former co-worker, that in 2003 Appellant wanted Rube to kill Appellant's then wife, Kami Harkey. RR Vol. 10 Page 156 - 157. Appellant drove Rube to Austin and pointed out Kami's apartment and other places that Rube could shoot Kami. RR Vol. 10 Pages 157 - 158. Appellant wanted Rube to make a silencer for a firearm to assist in the murder of Kami. RR Vol. 10 Pages 159 - 160. Appellant also discussed with Rube about Rube murdering Appellant's ex-wife who lives in Oklahoma. RR Vol. 10 Page 160. Appellant stated that in both murders Appellant wanted to create an alibi for himself. RR Vol. 10 Pages 160 - 161. Appellant wanted Kami killed because Appellant might lose custody of their child to her and he wanted his ex-wife killed because she had wronged him in their divorce. RR Vol. 10 Page 162. In response to Appellant's objection to this testimony the trial court instructed the jury as follows:

36

"And ladies and gentlemen of the jury, you may consider the evidence of other offenses alleged to have been committed by the defendant only if you believe that they are true beyond a reasonable doubt. And then that consideration must be limited to considering scheme, intent to engage in conspiracy, or you may consider it for rebuttal of defensive theories, and only those matters only, okay? So as we go forward, keep that instruction in mind."

RR Vol. 10 Pages 155 - 156.

Hank Powell, a former employee of Appellant, testified that Appellant came to him in 2003 looking for a silencer for a .22 caliber rifle. RR Vol. 10 Page 174. Powell reported this to law enforcement and was contacted by Texas Ranger Matt Linderman. RR Vol. 10 Pages 175 - 176. With equipment provided by Ranger Linderman a recording was made of Appellant describing how a lawn mower muffler could be adapted into a silencer for a weapon. RR Vol. 10 Page 179. Appellant gave Powell a lawn mower muffler and a rifle for the purpose of Powell converting the muffler into a silencer for the rifle. RR Vol. 10 Page 180. Powell in turn gave the rifle and the muffler to Ranger Linderman who sent them to a facility in West Virginia to be made into a silencer attached to the rifle. RR Vol. 10 Page 180. Appellant told Powell that he would be "long gone" when the rifle was being used. RR Vol. 10 Page 180. In response to Appellant's objection to this testimony the trial court instructed the jury as follows:

"Ladies and gentlemen, you can consider evidence of any other offense alleged to have been committed by the defendant only if you think it is true beyond a reasonable doubt. That consideration is limited to the scheme, intent to engage in conspiracy, or for rebuttal of defensive theories only, so please keep that in mind as we continue with this witness and for the prior testimony of this witness."

RR Vol. 10 Pages 178 - 179.

Texas Ranger Matt Linderman testified that he received the rifle and muffler provided by Appellant and sent them to a firearms lab in Washington DC to be made into a silencer for the rifle. RR Vol. 10 Page 184. The finished product was then given to Hank Powell to give to Appellant. RR Vol. 10 Page 185. Appellant was then arrested for unlawful possession of the silencer. RR Vol. 10 Page 186. The only objection made by Appellant was that this testimony was repetitive to that of Hank Powell. RR Vol. 10 Page 181.

In the Court's Charge the trial court instructed the jury as follows:

"The Defendant is on trial solely on the charges contained in the indictment. You are instructed that if there is any testimony or evidence before you in this case regarding the Defendant having committed acts or participated in transactions other than the transactions or acts alleged against the Defendant in the indictment in this case, you cannot consider such other acts or transactions, if any, for any purpose against the Defendant unless you find and believe beyond a reasonable doubt that the Defendant committed such other acts or participated in such other transactions, if any; and even then you may only consider the same for the purpose of **a)** rebutting a defensive theory, **b)** establishing the Defendant's intent to enter into a conspiracy with CARL WADE PRESSLEY or LILLIAN KING to commit the offense or offenses alleged in the indictment, or **c)** establishing the Defendant's motive or

38

scheme, if they do, and for no other purpose. You are further instructed that you may not consider other acts or transactions, if any, as any evidence of the Defendant's character in order to show that the Defendant acted in conformity therewith."

CR Vol. 1 Page 179 Paragraph 5.

This was further emphasized by the prosecutor during closing argument when

Mr. McAfee stated:

"Counsel also told you that when he went into those extraneous offenses we want you to find him guilty for some reason other than his guilt. No, we don't. In fact, I want to stress that. We don't want you to find him guilty because of those other things. You can't do that, and we can't urge you to, and we don't want you to find him guilty because of that.

"We want you to find him guilty because he is guilty."

RR Vol. 12 Page 56.

During Ranger De La Garza's interview with Appellant, Appellant described how Appellant talked Pressley into selling his future interest to Appellant and John by telling Pressley that Appellant intended to "....slap a lien against your grandmother's estate. Carl, it's called devaluing the assets of the remainders." "I said, "It's going to be as much for your benefit as it is for my and John's benefit, more so for his kids and everybody else. "Carl, it has to go through the probate first. Hell, that could take years." RR Vol. 13 State's Exhibit 108; Exhibit 109 Page 124.

In cross-examination of State's witness, Tommy Johnson, the following exchange occurred:

(Mr. Davis) And now whenever people are in the tractor supply place visiting, you talk about weather, right?

(Mr. Johnson) Yes, sir.

(Mr. Davis) And you talk about politics?

(Mr. Johnson) Yes, sir.

(Mr. Davis) And people express negative opinions about politicians, don't they?

(Mr. Johnson) Yes.

(Mr. Davis) And bad things they wish would happen to them, don't they?

(Mr. Johnson) Yes.

RR Vol. 10 Pages 64 - 65.

### 3.3 Discussion and Conclusion

The case being considered by the jury, that of the murder of Bonnie Harkey and of Karen Johnson, was one involving a conspiracy between Appellant, Carl Pressley, and Lillian King. Appellant was shown as the person who planned the murder of Bonnie Harkey and who recruited Pressley into putting Appellant's plan into play.

The motive of Appellant for this murder was to gain possession and control over the entire Harkey pecan estate which Appellant believed to be his inheritance and his legacy. Once Applicant had secured his inheritance, Applicant planned to move to Belize.

The evidence that Appellant had tried to recruit David Rube to kill Appellant's then wife, Kami, demonstrated a similarity to the present case in that Appellant sought to murder a family member in order to gain control over something that the victim had. In the case of Kami it was control over their child. In the case of Bonnie Harkey it was control over the Harkey estate.

The evidence that Appellant had tried to recruit David Rube to kill Appellant's ex-wife who lived in Oklahoma demonstrated a similarity to the present case in that Appellant sought to harm another in retaliation for a wrong Appellant was done to him. In the case of the ex-wife it was an unspecified wrong done to Appellant during the divorce. In the present case it was wrongs done to Appellant and Appellant's inheritance by Darrell Spinks for which Appellant attempted to recruit Jason Sandlin to "put the hurt on" Spinks.

Another similarity between the plan to have Kami and the ex-wife murdered and the plan to have Bonnie Harkey murdered is the element of creating an alibi for each of the murders. The details of the alibis planned for the murders of Kami and the

41

ex-wife were not specified beyond being "long gone", however, the alibi Appellant created for the murder of Bonnie Harkey, and the collateral murder of Karen Johnson, was being in Fort Worth playing golf with Appellant's brother, John Harkey.

The evidence admitted of Appellant acquiring a rifle and lawnmower muffler and then asking David Rube to make the muffler into a silencer and then fit the silencer onto the rifle which is to be used as the weapon to murder Kami demonstrated the similarity of the amount of detail Appellant put into the planning of the intended murders. In the case of Bonnie Harkey, Appellant threatened Pressley with filing liens against the estate which would devalue the Harkey estate and tie it up in probate for years if Pressley did not sell Pressley's future interest in the Prichard Orchard to Appellant and John Harkey. While this was occurring Appellant was negotiating the sale of the same property to famed actor Tommy Lee Jones. This sale was planned to close on April 12, 2012. Yet before this could happen Bonnie Harkey had to die.

Once Pressley sold his interest in the Prichard Orchard Appellant instructed Pressley on the use of a pillow to murder Bonnie Harkey as a means of leaving no fingerprints as evidence and pressed Pressley to have the murder done during that weekend in March 2012. As the date of the planned murder approached, Appellant,

to create his alibi, went to various businesses to announce his plans to be in Fort Worth over the weekend. Appellant also left a voicemail message with the same message to a prospective employer even though it was long past the date Appellant had been told that the position would be filled.

The testimony of Pat Pierce describing Appellant's solicitation of Pierce to kill Dick Miller and Jim Childress in exchange for a motorcycle was another demonstration of Appellant's motive to control his inheritance as Appellant believed each were "stealing" his land.

Pierce also described Appellant's solicitation of Pierce to kill San Saba County Sheriff Steve Boyd and San Saba County Justice of the Peace Les Dawson because Sheriff Boyd and Justice of the Peace Dawson were pressuring Appellant's wife for information about Appellant's involvement in the murders of Bonnie Harkey and Karen Johnson. This evidence was offered and admitted to show Appellant's consciousness of guilt as a reasonable jury could interpret this testimony as Appellant's attempt to prevent his present wife from giving evidence against Appellant in the same way that Carl Pressley and Lillian King did.

Further, this evidence of extraneous offenses was admissible to rebut the defensive theory that, much like the idea that people make idle talk about wanting bad things to happen to politicians, Appellant's more recent statements about

43

wishing Bonnie Harkey would be dead and the collateral talk that related to that issue was mere idle talk.

One final point on this issue, it should be noted that the trial court instructed the jury, not just once or twice, but many times on the limitations placed on them in consideration of the extraneous matters. Then the limitation instruction was included in the Court's Charge. There is nothing in this record to suggest that the jury did not understand or follow the trial court's limitation instructions when considering the extraneous matters admitted into evidence. This was further stressed by the prosecutor in his closing argument. The only one at trial suggesting to the jury that they are being asked to punish Appellant for his prior bad acts was Appellant's own trial counsel.

For these reasons the relief requested by Appellant by his Issue No. 3 should be denied and the judgment and sentence rendered against Appellant be affirmed.

## Summary Of The Argument on
## Response to Issue No. 4

**The State is not required to adhere to a ritualistic form to comply with TRE Rule 404(b). A copy of a statement referencing the extraneous bad act is sufficient to provide notice under the rule. In addition this evidence was in fact same transaction contextual evidence.**

Appellant complains that the trial court erred in admitting testimony from Pat Pierce that Appellant stated Appellant offered a motorcycle to a guy from East Texas to kill Bonnie Harkey because the prosecution had not given Appellant prior notice of its intent to offer such evidence. However Appellant did receive discovery that included a copy of a "tape" of Pat Pierce's statement in which this transaction is described with the exception of identifying Bonnie Harkey as the target. To the extent that the identity of the person to be killed was Bonnie Harkey, Appellant failed to show how he would have changed his trial strategy or presented his defense differently in any way and therefore failed to show how he was truly surprised or harmed in this regard.

## Argument On Response to Issue No. 4

### 4.1 Principals of Law

Rule 404(b) allows admission of certain extraneous offenses, provided that: "upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction." Tex. R. Evid. Rule 404(b); *Hayden v. State*, 66 S.W.3d 269, 271 (Tex. Crim. App. 2001).

Rule 404(b) does not set forth a formalistic method for conveying notice and does not require a writing. *Hayden*, supra at 273 fn. 16. While the State should not be permitted to engage in gamesmanship by finding creative ways to convey "notice" without really informing the defense of its intent to introduce extraneous offenses, the defense should not be permitted to engage in gamesmanship by claiming the notice it received was insufficient when the defense did in fact have actual notice of the State's intent to introduce the extraneous offenses in question. *Id.*

A reviewing court accepts as true factual assertions made by counsel at trial which could have been, but were not, disputed by opposing counsel. *Pitts v. State*, 916 S.W.2d 507, 510 (Tex. Crim. App. 1996).

The purpose of the Rule 404(b) (Tex. R. Evid.) notice provision of preventing surprise is a valid consideration in conducting a Rule 44.2(b) (Tex. R. App. Proc.) harm analysis. *Hernandez v. State*, 176 S.W.3d 821, 826 (Tex. Crim. App. 2005).

When an appellate court determines that a jury's verdict was substantially influenced by the improper admission of substantively inadmissible Tex. R. Evid. 404(b) evidence, that influence on the jury's verdict will always be "injurious" since there was no proper purpose for the jury to consider the evidence. But, this is not the case when substantively admissible Rule 404(b) evidence is improperly admitted because of the State's failure to comply with the Rule 404(b) notice provision. Under these circumstances, the error in admitting this evidence may have had a substantial effect or influence on the jury's verdict, but it cannot be said that this effect or influence was "injurious" if the defendant was not surprised by the evidence. *Hernandez*, supra at 825.

Where the State has provided a defendant copies of recorded statements describing extraneous acts yet the State did not provide a formalized notice of intent to use said extraneous acts at trial, it strains credulity to think that the defendant was not on notice that the State intended to use the recorded statements as a part of its evidence or that he had not prepared to defend against their use. *Hernandez*, supra at 826.

Where evidence constitutes same transaction contextual evidence, notice under TRE Rule 404(b) is not required. *Worthy v. State*, 312 S.W.3d 34 (Tex. Crim. App. 2010).

Background evidence, once called 'res gestae' of the offense, has also come to refer to other offenses indivisibly connected with the offense charged, and not only general background evidence which is helpful to the jury's understanding. *Mayes v. State*, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). The court further recognized that the broadening of the term res gestae led to confusion as to what exactly constitutes res gestae evidence. *Id.* ("Furthermore, the absence of jurisprudence on the infrequently litigated subject of background evidence has also created an analytical void, confusing the distinction between other offenses connected with a primary offense, and general background evidence."). Therefore, the court took the opportunity to distinguish between background evidence and evidence of "other offenses connected with a primary offense," which the court referred to as "same transaction" contextual evidence. *Id.* at 86.

Although a trial court must still perform a balancing test to see if the same transaction contextual evidence's probative value is substantially outweighed by its prejudicial effect, the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the

whole criminal transaction. *Mann v. State*, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986); *Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.--Houston [1st Dist.] 2003, pet. dism'd).

If a ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then the reviewing court must uphold the judgment. *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

## 4.2 Applicable Facts

In describing at trial statements made by Appellant while awaiting trial, fellow jail inmate Pat Pierce testified that Appellant not only offered Pierce a motorcycle to kill various people but that Appellant also stated that he had offered a motorcycle to a guy in East Texas to do a job for him. RR Vol. 10 Pages 91 - 92. To this the following occurred before the bench:

> "MR. ADAMS (Defendant): Judge, there's another issue about a notice issue on this extraneous offense. Somebody else is going to kill somebody else. I don't have any notice of that extraneous offense. So obviously you're talking about –
>
> "MR. MCAFEE (Prosecutor): You do. You have notice of it. I gave a transcript as well as the tape of this. You don't have to officially notice extraneous offenses. This is context for this extraneous –

"THE COURT: Here's what we're going to do, okay? And I thought we had an agreement before. It was agreed by Mr. Davis. The instruction's been given. You were going to object 404, and it was going to be overruled. Now, do I need to make an instruction every single time? Is that what you want?

"MR. ADAMS (Defendant): I'm just trying to preserve our record. I'll do what the Court directs me to do, but I just -- I mean my deal is, is that the running objection to this -- this extraneous that's coming in now, I didn't expect it. And, you know, I don't mean to disrupt the proceedings, but I'm just trying to do the best I can and preserve the record."

"THE COURT: Well, for the record with y'all's agreement, I'm going to reply when you ask for the instruction, to -- I'm just going to remind them to refer them back to the previous instruction just so the record is clear so that that instruction is the only one that's been given to them and that they're going to be reminded of it each time. So I don't mind you doing that to preserve your record, as long as we have that agreement that that's the instruction.

"MR. ADAMS (Defendant): I understand that.

"THE COURT: Is that okay?

"MR. ADAMS (Defendant): Yes, sir.

"THE COURT: Okay.

"MR. MCAFEE (Prosecutor): And this 404(b) information, whether it's contextual to the entire notice, but they've been given the transcript, they've been given the tape of this -- no, excuse me -- the transcript of this interview. That provided the notice in plenty of time.

"THE COURT: And that specific objection when he came to the bench was overruled so...

"MR. ADAMS: Thank you.

(Return to open court)

"Q    (By Mr. Mcafee) Mr. Pierce?

"A    Yes, sir.

"Q    What did he say about that guy with the motorcycle?  What did he say about the offer of the motorcycle, the guy from East Texas?

"A    The guy went to jail before he got to come down here.

"Q    And what was he offering that motorcycle to him for?

"A    To come down take care of Bonnie Harkey for him.

"Q    Bonnie Harkey? Did he specifically say Bonnie Harkey?

"A    Yes, sir.

"MR. ADAMS (Defendant): Okay, Judge, I'm sorry. I'm going to object and ask for a curative instruction to the jury as far as Bonnie Harkey goes. That's a notice issue. Under 404.

"MR. MCAFEE (Prosecutor): Well, that would be an admission by party opponent about the case-in-chief. It has nothing to do with 404(b).

"THE COURT: I'm going to overrule the objection.

"Q    (By Mr. Mcafee) Now, Mr. Pierce, I do want to ask – I want to clarify something. Now, you remember talking to Jack Schumacher, the investigator with my office, before, did you not?

"A    Yes, sir.

"Q    And I believe that in that -- in fact, the court reporter took down your statement, didn't she?

"A	Yes, sir.

"Q	And I believe in that statement, if I'm incorrect, that you said he wanted somebody with a motorcycle to come over and kill somebody, commit a murder for him.

"MR. ADAMS (Defendant): Objection, Your Honor. That's leading.

"THE COURT: Sustained.

"MR. ADAMS: Ask for a curative instruction.

"THE COURT: There's been no response so it's sustained.

"Q	(By Mr. Mcafee) Did you tell Mr. Schumacher that you said he -- or somebody from East Texas on a motorcycle was supposed to come over and commit a murder for him?

"A	Yes, sir.

"Q	Okay. Is it also clear that you didn't say Bonnie Harkey then?

"A	Not at that time.

"Q	Okay, sir. But today you recall that's what he was talking about?

"A	Yes, sir."

RR Vol. 10 Pages 92 - 96.

## 4.3 Discussion and Conclusion

The record shows that Appellant's initial objection was that the State had not given notice to Appellant of the intent to use Pierce's description of Appellant stating that he had offered a motorcycle to a guy in East Texas to kill someone else. This was countered by the Prosecutor's statement that Appellant's counsel had been provided a copy of both the recording of the pre-trial interview of Pierce and the transcript thereof. In as much as Appellant's counsel did not assert that what the Prosecutor stated was not true, the Prosecutor's statement that Appellant's counsel did in fact receive a copy of the recording and the transcript wherein Pierce described that Appellant told Pierce that Appellant wanted somebody with a motorcycle to come over and kill somebody, commit a murder for him is presumed to be true. To this point the State was not obligated to provide Appellant with a ritualistic form of notice so long as reasonable notice was given.

However, Pierce then continued his testimony wherein he stated that Appellant had told Pierce that Appellant had offered a motorcycle to a guy from East Texas to come down and take care of Bonnie Harkey for him. To this Appellant's trial counsel objected that counsel had received no prior notice that the witness would identify Bonnie Harkey as the intended victim of the guy from East Texas. Although the trial court overruled this objection, appellant failed to even attempt to

make any showing of how his defense strategy might have been different had the State explicitly notified him that it intended to offer at trial evidence that Bonnie Harkey was the intended victim, or how his defense was "injuriously" affected by the State's failure to provide reasonable notice of the identity of the intended victim.

At the same time, a continued reading of the testimony shows that the Prosecutor was also surprised by this revelation of Pierce that Bonnie Harkey was the intended target of the East Texas hitman. Beyond this point, Appellant has failed to show harm for the lack of notice. It is clear that Appellant had adequate notice that Pierce would testify that Appellant told Pierce that Appellant had offered a motorcycle to a guy in East Texas to come kill someone. It is clear that Appellant's trial counsel had a large amount of pre-trial discovery wherein Appellant made multiple statements around the same time period to various persons that Appellant wanted Bonnie Harkey to die. The only difference between the information contained in the notice and the testimony was that the someone in this instance was Bonnie Harkey. Even here, Appellant made no showing to the trial court that had Appellant known of the identity being Bonnie Harkey the trial strategy would have been different or that any specific witness would have been brought to court to rebut the testimony or that Appellant's trial counsel could or would have done anything differently.

Further, this testimony was in fact in the nature of same transaction context. Appellant was describing to Pierce how Appellant had started the series of events that ultimately lead to the murder of Bonnie Harkey by hiring the president of a biker club from East Texas to come in and do the murder yet this person ended up in jail before he could do the job. A reasonable jury could conclude from the evidence that when the initial plan did not come to fruition then Appellant turned to Plan B and recruited Pressley to do the deed, which Pressley did. As such, this testimony is not an extraneous bad act requiring notice under Rule 404(b).

For these reasons the relief requested in Appellant's Issue No. 4 should be denied and the judgment of conviction and sentence be affirmed.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellee prays the Court deny Appellant's appeal and affirm the judgment of the trial court.

Respectfully submitted,

OFFICE OF DISTRICT ATTORNEY
33RD and 424th JUDICIAL DISTRICTS
Wiley B. McAfee, District Attorney
P. O. Box 725
Llano, Texas 78643
Telephone          Telecopier
(325) 247-5755    (325) 247-5274

By: _____
      Gary W. Bunyard
      Assistant District Attorney
      State Bar No. 03353500
      g.bunyard@co.llano.tx.us
      ATTORNEY FOR APPELLEE

## CERTIFICATE OF WORD COUNT

This is to certify that the pertinent portion of this brief contains 12,074 words printed in Aldine401BT 14 font, including footnotes being in Aldine401BT 12 font, according to the WordPerfect™ X7 word count tool.

_____
Gary W. Bunyard

56

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the above and foregoing instrument, together with this proof of service hereof, has been forwarded on the 12th day of November 2015, to Richard Davis, Attorney for Appellant, by email and by EServe.

Gary W. Bunyard
Assistant District Attorney